1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

ABANTE ROOTER AND PLUMBING, INC.,
individually and on behalf of all other
similarly situated ,

                              Plaintiffs,

       -against-

NEW YORK LIFE INSURANCE COMPANY,

                              Defendant.

-------------------------------------X

                    1114 Avenue of the Americas
                    New York, New York

                    January 6, 2017
                    10:00 a.m.


       EXAMINATION BEFORE TRIAL OF NEW

YORK LIFE INSURANCE COMPANY, a DEFENDANT

in the above-entitled action, BY

CHRISTOPHER TEBEAU, held at the above

time and place, taken before a Notary

Public of the State of New York, pursuant

to Court Order and stipulations between

Counsel.

1                                    2

2

3          A P P E A R A N C E S:

4

    BRODERICK & PARONICH, P.C.
5
          Attorneys for Plaintiffs
6          99 High Street
          Suite 304
7          Boston, Massachusets   02110

8    BY: ANTHONY PARONICH, ESQ.

9

10

11

    SUTHERLAND ASBILL & BRENNAN, LLP.
12
          Attorneys for Defendant
13          1114 Avenue of Americas
          New York, New York 10036
14
    BY: LEWIS S. WIENER, ESQ.
15

16

17

18

19

20    ALSO PRESENT:

21    JEREMY N. KLATELL
    Associate General Counsel
22    New York Life Company

23

24

25

1                                              3
2
              *          *          *
3
4          S T I P U L A T I O N S
5
      IT IS STIPULATED AND AGREED by and
6   between the attorneys for the respective
    parties herein, and in compliance with
7   Rule 221 of the Uniform Rules for the
    Trial Courts:
8
9
      THAT the parties recognize the
10  provision of Rule 3115 subdivision (b),
    (c) and/or (d). All objections made at a
11  deposition shall be noted by the officer
    before whom the deposition is taken, and
12  the answer shall be given and the
    deposition shall proceed subject to the
13  objections and to the right of a person
    to apply for appropriate relief pursuant
14  to Article 31 of the CPLR.
15
16      THAT every objection raised during a
    deposition shall be stated succinctly and
17  framed so as not to suggest an answer to
    the deponent and, at the request of the
18  questioning attorney shall include a
    clear statement as to any defect in form
19  or other basis of error or irregularity.
    Except to the extent permitted by CPLR
20  Rule 3115 or by this rule, during the
    course of the examination persons in
21  attendance shall not make statements or
    comments that interfere with the
22  questioning.
23
24      THAT a deponent shall answer all
    questions at a deposition, except (i) to
25  preserve a privilege or right of

1                              4
2   limitation set forth in an order of a
    court or (iii) when the question is
3   plainly improper and would, if answered,
4   cause significant prejudice to any
    person. An attorney shall not direct a
5   deponent not to answer except as provided
    in CPLR Rule 3115 or this subdivision.
6   Any refusal to answer or direction not to
    answer shall be accompanied by a succinct
7   and clear statement of the basis
    therefore. If the deponent does not
8   answer a question the examining party
    shall have the right to complete the
9   remainder of the deposition.
10
11      THAT an attorney shall not interrupt
    the deposition for the purpose of
12  communicating with the deponent unless
    all parties consent or the communication
13  is made for the purpose of determining
    whether the question should not be
14  answered on the grounds set forth in
    Section 221.2 of these rules and, in such
15  event, the reason for the communication
    shall be stated for the record succinctly
16  and clearly.
17
18      THAT failure to object to any
    question or move to strike any testimony
19  at this examination shall not be a bar or
    waiver to make such objection or motion
20  at the time of the trial of this action
    and is hereby reserved; and
21
22
        THAT this examination may be signed
23  and sworn to by the witness examined
    herein before any Notary Public, but
24  failure to do so or to return the
    original of the examination to the
25  attorney on whose behalf the examination

1                                              5

2    the rights provided by Rules 3116 and
     3117 of the CPLR, and shall be controlled
3    thereby, and

4        THAT certification and filing of the
     original of this examination are waived;
5    and

6

         THAT the questioning attorney shall
7    provide counsel for the witness examined
     herein with a copy of this examination at
8    no charge.

9

10

11                    *          *          *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C. Tebeau                    6

2     C H R I S T O P H E R   T E B E A U,

3     having first been duly sworn by a Notary

4     Public, was examined and testified as

5     follows:

6

7     EXAMINATION BY

8     THE REPORTER:

9

10            Q.   Please state your name for

11    the record.

12            A.   Christopher Tebeau.

13            Q.   Please state your address for

14    the record.

15            A.   One Rockwood Road, Sleepy

16    Hollow, New York 10591

17

18    EXAMINATION BY

19    MR. PARONICH:

20            Q.   Mr. Tebeau, we are on the

21    record.

22            MR. PARONICH:   As I

23        discussed with my opposing

24        counsel, we are going to keep

25        all objections other than those

```
1                    C. Tebeau                7
2        as to form reserved until
3        trial.
4                    Are we in agreement,
5        Lou?
6                    MR. WIENER:  We are.
7             Q.   Mr. Tebeau, have you ever
8        given a deposition before?
9             A.   I have.
10             Q.   Okay.  Great.  I will skip
11        some of the ground rules and keep the
12        others in.
13                    As you heard, my name is Anthony
14        Paronich.  I am one of the attorneys
15        working for the plaintiff on this case.
16                    With the deposition the court
17        reporter takes down everything we say.
18        So in typical conversation I have a bad
19        habit of interrupting people, because I
20        always assume I know what they are going
21        to say.  Here, we will just be here
22        longer if you do, so if you could try to
23        wait until I finish my question before
24        you answer I would appreciate it.
25             A.   Okay.
```

1                   C. Tebeau                    8

2          Q.   Perfect.   I think you are

3    going to understand a lot of what I ask

4    today.   If at any time you don't it is

5    okay to say so.   The issue with

6    developing a record is that it is hard to

7    think -- to say later you don't

8    understand the question if you don't say

9    it.   If you are close, let us know and we

10   will work through it.   Fair enough?

11         A.   Fair enough.

12         Q.   Are you on any medications or

13   imbibed in any way that would prevent you

14   from giving truthful testimony today?

15         A.   No, no.

16         Q.   Another ground rule that I

17   personally like to go over because I

18   think it is important is, there wouldn't

19   be anything that we cover today that even

20   if it is responsive to my question I want

21   to know about a conversation you had with

22   Lou or Jeremy.

23         A.   Okay.

24         Q.   So just to the extent that

25   something I ask would be inclusive of

```
1                    C. Tebeau                    9
2     that, push it to the side.
3            Another important thing is you
4     can take -- we aren't going to be here
5     that long -- you can take a break any
6     time.  The only caveat is if I have a
7     question we like to do our best to have
8     you answer that question then we take a
9     break.  Is that all right?
10           A.   Okay.
11                MR. WIENER:  I assume
12        you did not intend to limit the
13        attorney/client privilege to
14        any conversations that the
15        witness may have had with
16        myself or Mr. Klatell, but any
17        attorneys that he may have had
18        in connection with this case.
19                MR. PARONICH:  Of
20        course.  I was just trying to
21        provide some context.
22           A.   Yes.
23           Q.   So, Mr. Tebeau, do you
24     understand that today you are here to
25     testify in a corporate capacity on behalf
```

1          C. Tebeau                    10

2     of New York Life?

3          A.  I do.

4          MR. PARONICH:  The

5       first exhibit, please.

6          (Whereupon, a Deposition Notice

7     was received and marked as Plaintiff's

8     Exhibit 1 for identification as of this

9     date, by the reporter.)

10          Q.  The court reporter has just

11     marked as Exhibit 1 a document.  Have you

12     seen this document before?

13          A.  I have.

14          Q.  So this is the Deposition

15     Notice issued by the plaintiff.  I would

16     ask that you turn to the second page.  At

17     the bottom of that page it starts a list

18     of various topics.  I would like to just

19     make sure that you are here.  If you

20     could please review topic one on the

21     third page, two, three, four and confirm

22     that you are hereto testify about all of

23     those topics.  Please take as much time

24     as you need.

25          A.  Yes, I am.

1          C. Tebeau                    11

2          Q.  I am going to ask you some

3    question related to the topics, but first

4    I would like some background about

5    yourself and how you got to New York

6    Life.  Could you give me your educational

7    background starting with any high school

8    you completed?

9          A.  Sure.  I completed high

10   school it is called Berner High School in

11   Massapequa, New York.  I graduated from

12   Villa Nova University.  I don't know if

13   you need to know degrees.

14         Q.  Sure.

15         A.  Yes, Bachelor of Science in

16   accounting and minor in computer science

17   and then I subsequently graduated from

18   Brooklyn Law School.

19         Q.  Okay.  Great.

20         Was New York Life your first job

21   out of law school?

22         A.  Actually I started in New

23   York Life before I went to law school.  I

24   went to law school at night when I was

25   employed at New York Life.

1                    C. Tebeau                    12

2          Q.   When did you start at New

3    York Life?

4          A.   June of 1988.

5          Q.   What was your first position

6    at New York Life?

7          A.   I believe it was called

8    assistant auditor, basically in a

9    training program in the auditing

10   department.

11         Q.   Just to provide some context

12   for me, in 1988 were you in college or

13   was that after college?

14         A.   It was right after I

15   graduated college.

16         Q.   At the 10,000 foot view, if

17   you wouldn't mind, could you let me know

18   what an auditor does?

19         A.   Yes, our auditing department

20   basically we would go visit different

21   areas of the department and either do

22   operational or financial audits,

23   basically report to the company looking

24   for -- to ensure controls are adequate to

25   protect the company, things like that.

```
 1              C. Tebeau                  13

 2         Q.  I understand.  Thank you.

 3         What was your next position with

 4    the company?

 5         A.  Okay.  Audit -- I had a

 6    couple of different, you know,

 7    promotions.  The next department I was in

 8    was the corporate compliance

 9    department.

10         Q.  Just to try to be as

11    efficient as possible, you mentioned you

12    had a couple of promotions while you were

13    an auditor, did your responsibilities

14    change with those promotions?

15         A.  Not dramatically, just

16    overseeing people, but you are still

17    conducting audits.

18         Q.  I understand.  I am happy to

19    move to the next position then.

20         What would your day-to-day

21    responsibilities be in corporate

22    compliance?

23         A.  My primary role in -- our

24    division was called field review, so

25    basically what we did was visit our
```

1                    C. Tebeau                    14

2    general offices around the county and do

3    compliance and supervisory audits

4    effectively.

5              Q.  Did you say "our general

6    offices"?

7              A.  They are called general

8    offices, GO.

9              Q.  Sorry, for the uninitiated

10   what does that mean?

11             A.  Yes, general office we have

12   roughly 120 or so of them around the

13   county.  That is a, you know, a brick and

14   mortar building where a local management

15   team has offices, desks and they recruit

16   agents into, sometimes agents are housed

17   there, sometimes not, but it is sort of

18   the New York Life flagship in that

19   particular town.

20             Q.  Understand.  Thank you.

21             Do you remember what year you

22   started with the corporate compliance

23   department?

24             A.  I believe it was '97, '96 or

25   '97.

1                    C. Tebeau                    15

2           Q.   I am sure you had a lot of

3    different responsibilities in that

4    office, but did one of them relate to

5    compliance with state and federal

6    telemarketing laws?

7           A.   I don't think at the time we

8    specifically covered that.

9           Q.   So when you would go to the

10   different GOs would your compliance

11   efforts be focused on the actions that

12   the agents themselves were taking with

13   respect to trying to generate new

14   business?

15           MR. WIENER:   Objection

16       to the form.

17           You could answer.

18           A.   Yeah, I am not sure I

19   completely understand the question.  Our

20   audits would be basically looking at

21   procedures that were in place in the

22   offices to confirm compliance with, you

23   know, both internal and external rules

24   and regulations.

25           Q.   I understand.

1                     C. Tebeau                    16
2              A.  Yeah, I am not sure how much
3     detail you want to get into.
4              Q.  That answers my question.
5              With respect to -- I understand
6     you are looking at both internal and
7     external regulations.  I am trying to
8     narrow down on the who you were looking
9     at.
10             A.  Right.
11             Q.  Are those New York Life
12    agents?
13             A.  Yeah, the visits we would
14    interview more employees although those
15    visits would also include some sampling
16    of meetings with agents.
17             Q.  Understood.  Thank you.
18             Did you move to a different
19    department outside of compliance after
20    that?
21             A.  Yes, the department I am
22    currently in is agency, yeah.
23             Q.  When did you move to
24    agency?
25             A.  You know, I think it was

```
1                 C. Tebeau                17
2    2000.  It could have been '99, '99,
3    2000.
4          Q.  So your memory is you were in
5    corporate compliance for a few years?
6          A.  Yes, seven, eight years,
7    yes.
8          Q.  The department you said is
9    agency; is that correct?
10         A.  Agency department and the
11   division is agency standards.
12         Q.  Agency standards, I am
13   sorry?
14         A.  Yes, that is the division.
15         Q.  What was your position when
16   you started with agency standards?
17         A.  I believe I joined agency
18   standards and the title was director.  So
19   then director, assistant vice-president
20   and currently corporate vice-president.
21         Q.  Just to cross this last T,
22   wherein this time line did you attend
23   Brooklyn Law School?
24         A.  That was when I was still in
25   audit.  I started in 1990, I graduated in
```

1                 C. Tebeau                    18

2       '94.

3              Q.   Thank you.

4              So when you were a director of

5       agency standards could you explain to me

6       your responsibilities of that position?

7              A.   Sure.   The -- I am trying to

8       think -- day-to-day our overall role it

9       is supporting the field in the

10      supervision of agents and registered

11      reps, so there are, you know,

12      interactions, communications with

13      standards people in the field, but also

14      some functions that we perform

15      independently of the field.   It is just

16      difficult to think that far back to what

17      specific functions.   One, for example,

18      would have been e-mail monitoring, so we

19      did some of that.   We were responsible

20      for supervision of e-mail.

21             Q.   When you say "e-mail

22      monitoring", are those e-mails that the

23      agents would send to perspective

24      clients?

25             A.   Yes.

1                    C. Tebeau                    19

2           Q.   Was there any similar

3    monitoring that you did with respect to

4    telemarketing of agents?

5           A.   No.

6           Q.   Your next promotion in the

7    agency standards department was the

8    vice-president; is that correct?

9           A.   Assistant vice-president.

10          Q.   How did your role change when

11   you took that position?

12          A.   Really it is more a matter of

13   reporting responsibilities.  I think a

14   couple of direct reports, more

15   flexibility, you know, a manager leaning

16   on me more on a day to day, but I don't

17   think functionally anything dramatically

18   different.

19          Q.   I will focus on the function.

20          After your assistant

21   vice-president position was

22   vice-president?

23          A.   No, I am still not

24   vice-president.  Corporate vice-president

25   is what I am.  Vice-president is one

1          C. Tebeau                    20

2    level above corporate.

3          Q.   Your next promotion?

4          A.   Is corporate vice-president,

5    yes.

6          Q.   As corporate vice-president

7    did your day-to-day job responsibilities

8    change?

9          A.   Not dramatically.  You know,

10   there are more functions that I am

11   involved in in terms of interacting with

12   the field, in terms of communications

13   with the field, you know, TCPA is one of

14   them, some communications have gone out

15   in my name, but, yes, standards is -- it

16   is a wide range scope of

17   responsibilities, so yeah, you almost

18   have to be a jack of all trades in a lot

19   of things.

20          Q.   I understand.  Thank you.

21          I want to, Mr. Tebeau, could you

22   turn to the document start was the

23   30(b)(6) topics.  I got a little review

24   of it at the end there.  Could you

25   explain to me how your job in the agency

1              C. Tebeau                21

2    standards department would relate to

3    ensuring TCPA compliance?

4         A.   Sure.

5              MR. WIENER:  Mr. Paronich, I

6         want to be sure, we are now

7         getting into, number one, on this

8         I am trying to tie your question

9         as we get more specific to the

10        30(b)(6) topics the witness has

11        been designated to testify about.

12             MR. PARONICH:  Correct.

13        A.   Okay.  So my specific efforts

14   to ensure TCPA compliance?

15        Q.   Please.

16        A.   Yeah, there is a number of

17   them.  There is a couple of different

18   ways to start.  One of them was, you

19   know, producing communications to the

20   field, to make them aware that the rules

21   are out there, what the expectations are

22   for them to comply, and also the tools

23   available to them to facilitate

24   compliance.  This is certainly one of

25   them.  Those communications, as I think

1               C. Tebeau                22

2    you have seen in the exhibits, Field News

3    and also e-mail blasts that put out

4    periodically, again to remind the field

5    of what the rules are, what the law is,

6    what the expectations are, and also link

7    them, provide them a link to more

8    detailed information that is available to

9    them on what we call agency portal,

10   basically a website, series of websites

11   that the field has access to.

12          Q.  We will get into agency

13   portal for a little later.  Thank you for

14   your answer.

15          I will ask about the second topic

16   which is on page three.  Actually, I am

17   sorry, before we leave that first topic.

18   Other than speaking to your attorneys did

19   you speak to any employees of New York

20   Life to prepare to testify about topic

21   one today?

22          A.  I didn't.  I have normal

23   ongoing topics with people that cover

24   this, but nothing specifically to prepare

25   for this.

```
 1                 C. Tebeau                 23

 2         Q.  Understood.

 3         I am going to ask you the same

 4    question with respect to topic two, which

 5    is "All communications and any business

 6    relationship between you and

 7    LiveTransfers.com".  In advance of this

 8    deposition did you speak to anyone other

 9    than your attorneys about that?

10              A.  No.

11              MR. WIENER:  Objection

12         to the form of the question to

13         the extent that you is not a

14         defined term.  I want to be

15         sure that when we talk about

16         you, you are referring to New

17         York Life.

18              MR. PARONICH:  Yeah,

19         that is fair enough.  I won't

20         rephrase.

21         A.  No, no, New York Life had no

22    relationship with LiveTransfers.

23              Q.  How do you pronounce the

24    name?

25              A.  Hariri.
```

```
 1                    C. Tebeau                    24
 2           Q.   So I am going to try with
 3    Mr. Hariri.
 4           A.   Yes, okay.
 5           Q.   The third topic is "Bardia
 6    Hariri's, and other provisional
 7    employees, job responsibilities of New
 8    York Life".  As someone in the agency
 9    standards field for over ten years you
10    have a pretty good foundation of
11    knowledge?
12           A.   I do.
13                MR. WIENER:   Objection
14        to the form.
15                MR. PARONICH:   It was a
16        poor question.  I would have
17        withdrawn it if I actually
18        cared.
19           Q.   My question is:  Did you
20    speak to anyone else at the company about
21    topic three other than your attorneys
22    preparing for the deposition?
23           A.   No.
24           Q.   Is that because your job
25    responsibilities at New York Life gave
```

1              C. Tebeau                25

2    you intimate knowledge of this topic?

3         A.  It does, yes.

4         Q.  So the last topic,

5    Mr. Tebeau, we're going to discuss today

6    is number four which is "your efforts to

7    take" -- your meaning New York Life,

8    efforts -- "to take any remedial steps to

9    ensure that the allegation of the

10   Plaintiff's Complaint do not occur

11   again".

12        A.  Okay.

13        Q.  You are also here to testify

14   about that topic; is that correct?

15        A.  I am.

16        Q.  Other than conversations with

17   your attorneys have you spoken to any New

18   York Life employees about those remedial

19   steps?

20        A.  About actually executing the

21   steps?

22        Q.  Yes.

23        A.  Yes, there have been other

24   New York Life employees involved in

25   executing those steps, yes.

1              C. Tebeau                    26

2         Q.   We will get into exactly what

3    those conversations were potentially a

4    little later.

5         A.   Okay.

6         Q.   I would like to know the

7    names of the employees if you can

8    remember them.

9         A.   Sure.  My direct boss Sandra

10   Gill.

11        Q.   Is that G-I-L-L?

12        A.   G-I-L-L, yes.  I have a

13   gentleman that reports to me, Michael

14   Boubert, B-O-U-B-E-R-T, and, you know,

15   Sandra's boss, Gerard Rocchi is a senior

16   vice-president.  We had conversations

17   about remedial steps that would be

18   appropriate.

19        Q.   So we are done with that

20   exhibit for the time being.

21             So with respect to New York

22   Life's business practices -- so I make

23   sure I use the right terminology so we

24   have a clean record -- is there a

25   difference between agent and provisional

1                    C. Tebeau                    27

2    employees?

3            A.   Well, I think the provisional

4    employee that you are talking about it is

5    they are an agent at the same time, but

6    there are different sort of categories of

7    agents.  One of which is a provisional

8    employee and others which are not.

9            Q.   It would be helpful to me if

10   you know, if you could explain the

11   different levels of agent.

12           A.   Sure, the provisional

13   employee that you are referring to that

14   we refer to as PTAS agent it is basically

15   a part-time agent.  Probably easiest way

16   to explain that it is someone who is

17   considering becoming an agent and they

18   come on as basically a part time.  They

19   are not committed to this being their

20   sole job.  They can attend classes, learn

21   about the provisions, I would say they

22   need to be licensed.  They would be able

23   to sell, but they are not full time and

24   there are some commitments that come with

25   going full time that they would have to

1                    C. Tebeau                    28

2    make before graduating.  I will call it

3    graduating from that part-time contract

4    to a full-time agent contract.

5              Q.  What was the word you used,

6    PTAS?

7              A.  PTAS.

8              Q.  Okay.  Does every new New

9    York Life agent start as a PTAS?

10             A.  Everyone who is new to the

11   business.  Like somebody who is just

12   coming into the insurance industry, yes,

13   they would start as a PTAS.

14             Q.  That I understand.  I would

15   like to before we move onto the next

16   level of agent I would like to kind of

17   finish covering the PTAS.

18             A.  Okay.

19             Q.  Which is -- assume I have an

20   insurance license but I want to approach

21   the insurance business with New York

22   Life, do I fill out an application on the

23   website or how do I begin?

24             A.  Typically you might respond

25   to an ad, you might walk into an office,

1                C. Tebeau                29

2    there would be an interview process, like

3    most jobs.  As I understand it there

4    would be two, three, four interviews to

5    between a manager and an agent candidate

6    to help ensure this is a right fit, but,

7    yes, it would be an interview process

8    like most other jobs.

9              Q.  Understood.

10             So then New York Life receives

11   the application of the individual, what

12   happens next?

13             A.  Okay.  So if a local office

14   wishes to hire a candidate there are --

15   we call them hiring guidelines.  It is

16   different levels of approval that would

17   be required in order for someone to be

18   hired as an agent.  Again, those would

19   depend on if there is a criminal history,

20   regulatory history, financial issues, and

21   different levels of approval.  For

22   example, a local office could approach

23   certain candidates, the managing partner,

24   the person in charge of that office,

25   could approve some contracts, some

1                   C. Tebeau                    30

2    contracts would require that person's

3    approval plus the approval of someone at

4    what we call zone offices.  The last

5    level would require both of those sets of

6    approvals and a third level of approval

7    which is at the home office.

8              Q.  I understood that.  Okay.

9    Thanks.  So the approval occurs --

10             A.  Okay.

11             Q.  -- what happens next for the

12   PTAS employee?

13             A.  Okay.  So they're approved,

14   they would already be licensed.  It is

15   kind of a requirement coming in.  They

16   would be -- yeah, it is difficult to say

17   specifically.  They would have access

18   to -- they would be presented training on

19   any number of topics through what we call

20   NYLIC University.

21             Q.  I apologize for interrupting

22   you.  I am glad you mentioned that.  That

23   is what I wanted to cover next.

24             A.  Okay.

25             Q.  Is it New York Life

1                    C. Tebeau                    31

2       University you said?

3              A.   Yes, NYLIC University.

4              Q.   Is it only PTAS employees

5       that attend NYLIC University?

6              A.   No.

7              Q.   I now understand how the PTAS

8       employees get there.  Could you please

9       explain to me how other employees would

10      get there?

11             A.   Well, PTAS agent becomes a

12      TAS agent, right, so they become a part

13      time -- by producing a threshold amount

14      of business and by giving up any

15      conflicting outside business activities,

16      you know, for the most part that is a

17      formality, but what happens when they, I

18      will say graduate from PTAS to TAS, is

19      they then become eligible to be paid on

20      top of commissions training allowance.

21             So no real difference in terms of

22      what their day-to-day responsibilities

23      are.  They just have to give up outside

24      business activities in exchange for

25      training allowance.  That is just a

```
1                    C. Tebeau              32
2    requirement of the contract that has been
3    filed with the various states.
4            Q.  So I understand that.  So
5    thank you.
6            So in the NYLIC University there
7    could be some PTAS employees and some TAS
8    employees, correct?
9            A.  That's correct.
10           Q.  Are there any other kind of
11   employees?
12           A.  I will strike that.
13           Q.  Are there any other kind of
14   employees at NYLIC University?
15           A.  There could be other agents
16   that are recruited in -- that have
17   experience in the industry, so they
18   wouldn't typically go through the same
19   kinds of classes they would have access
20   to it.
21           Q.  So now I would like to circle
22   back to NYLIC University and talk about
23   what goes on there a little bit.  How
24   long is the university?
25           A.  The -- yeah, it is made up of
```

1                  C. Tebeau                    33
2    modules they are designed to span the
3    entire three year TAS period.  Certainly
4    some are the more basic that would be
5    covered in the first six to 12 months.
6    Then there are more advanced topics that
7    would be covered later on.
8             Q.  So when you say module, do
9    you mean a computer training program that
10   each individual takes?
11            A.  There is both.  A lot of the
12   modules are in person, a trainer in the
13   office sits down in a training room with
14   agents and walks through material that
15   has been created for that purpose.
16            Q.  Understood.
17            Those trainers that you mentioned
18   that could be giving the training at
19   NYLIC University are those also New York
20   Life employees?
21            A.  They are.
22            Q.  Are any of those modules
23   related to telemarketing restrictions?
24            A.  Yes.
25            MR. WIENER:  Objection

1                    C. Tebeau                    34

2        to the form.

3                    You can go ahead and

4        answer.

5             A.   There are modules that cover

6    telemarketing.

7             Q.   Do you know if those modules

8    related to telemarketing have specific

9    names?

10                   MR. WIENER:   Objection

11       to the form.

12            A.   Yeah, I don't know the

13   specific title of the module.

14            Q.   Okay.   So just to be clear,

15   did you understand my question but you

16   don't know the name of the --

17            A.   Right, I don't know the name

18   of the module in which TCPA is covered.

19                   MR. WIENER:   The basis

20       of my objection to form is the

21       term "telemarketing".   It is a

22       very broad topic.   It is not

23       clear to me what you mean by

24       telemarketing.   So it is a form

25       objection, because I think your

1                C. Tebeau                    35

2        question is vague and

3        ambiguous.

4                MR. PARONICH:  Okay.

5                MR. WIENER:  You may

6        want to clarify that for

7        purposes of the deposition.

8                MR. PARONICH:  I think

9        I am okay with it.  I think he

10        understood what I meant and I

11        don't think it is vague.

12            Q.  Can a PTAS employee make

13    outbound telephone calls to try to

14    solicit new business for New York Life?

15            A.  Yes.

16            Q.  Can a TAS employee try to

17    make outbound telephone calls to solicit

18    business to New York Life?

19            A.  Yes.

20            Q.  Are there any privileges with

21    respect to outbound telephone calls only

22    that a TAS agent has but the PTAS agent

23    does not have?

24            A.  No.

25            Q.  You mentioned earlier that

1                    C. Tebeau                    36

2     the TAS time period is three years?

3          A.   Yes.

4          Q.   What -- sorry to make the

5     sharp left turn here -- what comes next

6     in terms of level of agents?

7          A.   After three years of TAS they

8     become what is called an established

9     agent.

10         Q.   Is part of becoming an

11    established agent having graduated from

12    NYLIC University?

13         A.   That is part of it.

14         Q.   There is also the three-year

15    period, correct?

16         A.   The three years you are not

17    entitled to training allowance any more

18    just based on the terms of the contract.

19    You become established and some of the

20    restrictions, because you are no longer

21    getting training allowance, get a little

22    bit more flexibility.

23         Q.   Understood.

24         So if a TAS employee wants to

25    make outbound telephone calls to generate

```
 1                   C. Tebeau                  37
 2   new business are there any prior approval
 3   steps that that individual needs to take
 4   with New York Life to start that?
 5                   MR. WIENER:  Objection
 6      to the form.
 7                   You could go ahead and
 8      answer.
 9            A.  I am not sure I completely
10   understand it.  There is training that
11   they have access to.  Each PTAS and TAS
12   agent would also be given access to or
13   given a password to a system called
14   Gryphon, G-R-Y-P-H-O-N, and basically
15   that is a system designed to ensure that,
16   that they are in complies with TCPA.
17            Q.  Understood.  Thank you.  It
18   is what I was trying to get at.
19            So the Gryphon system each -- do
20   PTAS agents also have credentials for
21   that system?
22            A.  They do.
23            Q.  Would it be a violation of
24   their contract for a New York Life agent
25   to try to make outbound telephone calls
```

1                    C. Tebeau                    38

2    not using the Gryphon system?

3              A.   It would be.

4              MR. WIENER:   Objection

5         to the form of the question.

6              You can go ahead and

7         answer.

8              A.   It would be unless they have

9    a clear exception under TCPA.

10             Q.   So, like I said, we do

11   understand what the Gryphon system is, am

12   I correct, it is a system developed by a

13   third party not New York Life; is that

14   correct?

15             A.   That's correct.

16             Q.   Could you please give me an

17   overview of what New York Life employee

18   would need to do if they wanted to start

19   dialing on the Gryphon system?

20             A.   Sure.   They are granted a --

21   they would all have an 800 number to dial

22   into then each agent is given a code, it

23   is a four, six digit code.   When they put

24   that code in, the system knows it is them

25   and then they can go and dial whatever

1          C. Tebeau                39
2  number they are looking to dial.  Gryphon
3  is set up to block numbers that are on
4  federal, state or internal do not call
5  lists.
6          Q.  So I understand that and I
7  understand how the Gryphon system would
8  work, so thank you.
9          Does New York Life share outside
10  of the Gryphon system with PTAS or TAS
11  employees and internal do not call list?
12          A.  There is -- there is a place
13  on agency portal where they can type in a
14  number, a phone number, and see it is on
15  a list.
16          Q.  Not to belabor the point, but
17  New York Life does maintain a list of
18  individuals who had previously asked not
19  to be solicited?
20          A.  Absolutely, yes, yes.
21          Q.  If an individual is using the
22  Gryphon system and makes a outbound
23  telephone call to try to generate new
24  business and on that call an individual
25  says "I would no longer like to be

```
1                 C. Tebeau              40
2    contacted", is there is a process in
3    place to add an individual to the do not
4    call list?
5              A.  Yes.
6              Q.  Could you explain that to me,
7    please?
8              A.  There are two different
9    options.  There is a number that the
10   agent can hit during that call that would
11   enable for that to happen automatically,
12   or the agent has access on agency portal
13   to go in and to put that number in the
14   system.
15             Q.  Understood.  Thank you.
16             Mr. Tebeau, I would like to next
17   talk about the agents and their directive
18   with respect to generating new business.
19             A.  Okay.
20             Q.  Are there any parameters
21   given to new agents with respect to new
22   business?
23             MR. WIENER:  Objection.
24             Mr. Paronich, could you
25     tell me which of the four items
```

```
1              C. Tebeau                41
2        this relates to?
3              MR. PARONICH:  Sure, I
4        sure can.
5              MR. WIENER:  I want to
6        be sure.
7              MR. PARONICH:  So my
8        line of questioning here which
9        is very short is with respect
10       to New York Life taking steps
11       to ensure TCPA compliance it
12       would include giving
13       individuals, heres a guideline
14       of what you can sign up, but it
15       is not unfair objection and I
16       will spend about three minutes
17       on it.
18          Q.  So I would be happy to
19    rephrase or reask the question.
20          A.  If you wouldn't mind.
21          Q.  No problem at all.
22          So New York Life agents they
23    wanted to generate new business of
24    course?
25          A.  Um-hum.
```

Page 42

1                    C. Tebeau                42

2          Q.   Do they have income or

3    geographic parameters that they are given

4    to generate new business?

5                    MR. WIENER:  Objection

6          to the form of the question as

7          being outside of the scope.

8                    Go ahead and you can

9          answer it.

10         A.   Yeah, there is no geographic

11   limits other than, you know, if you are

12   an agent licensed in certain state you

13   can only solicit within those states.

14   Agents do have production minimums.  We

15   mentioned the PTAS agent earlier.  He or

16   she has a threshold level of commissions

17   they need to earn in order to graduate to

18   TAS and then within TAS there is an

19   ongoing minimum level of production that

20   is required to maintain the contract.

21         Q.   Understood.  Thank you.

22                Earlier in the deposition you had

23   mentioned that an agent needed to log on

24   to the Gryphon system to do solicitation

25   unless it was a clear TCPA exception; is

1                    C. Tebeau                    43

2      that correct?

3              A.   That is correct.

4              Q.   So is one of those clear TCPA

5      exceptions customer service

6      responsibilities that an agency might

7      have?

8              A.   Yes, an existing customer,

9      yes.

10             Q.   When you give that testimony

11     earlier, I will add assumed you were

12     talking about that instance, are there

13     any other clear exceptions that you were

14     thinking of?

15             A.   No, no, that is the main

16     one.

17             Q.   So when an agent brings in

18     new business is there a vetting process

19     at New York Life to confirm that that

20     customer generated came to New York Life

21     through a lawful process?

22                  MR. WIENER:  Objection

23        to the form of the question.

24        It is a form as it is also

25        outside of the scope.

1          C. Tebeau                    44

2          MR. PARONICH:  I don't

3     think it is outside of the

4     scope.  I would believe it

5     would relate to New York Life's

6     efforts to ensure TCPA

7     compliance where if a new

8     customer is coming into the

9     office is there or is there not

10    a process in place to make sure

11    they weren't unlawfully

12    solicited.

13          MR. WIENER:  Thank you.

14    That isn't the question that

15    you asked.  I think that makes

16    it clearer for the witness.

17          MR. PARONICH:  Then I

18    would be happy to rephrase.

19    Q.  Does New York Life have a

20  process when new business is originated

21  to ensure that the customer was not

22  unlawfully solicited?

23          MR. WIENER:  Same

24    objection.  I think you just

25    asked the same question.

Page 45

1            C. Tebeau                    45

2            You can go ahead and

3      answer it.

4            A.  Yes, I think it is sort of a

5      two-part answer.  In terms of unlawfully

6      solicited, kind of looping back to my

7      licensing, there are controls to ensure

8      that business that comes in, person lives

9      in a certain state, works another state,

10     the agent is appropriately licensed for

11     that.  There isn't a specific step that

12     would look at the application or other

13     documentation and somehow confirm that

14     the person wasn't called in a way outside

15     of the law.

16            Q.  Okay.

17            MR. PARONICH:  Next

18     exhibit.

19            (Whereupon, a Contract was

20     received and marked as Plaintiff's

21     Exhibit 2 for identification as of this

22     date, by the reporter.)

23            MR. PARONICH:  I will

24     actually ask this question for

25     each of the three remaining

1              C. Tebeau              46

2      documents.  Can we stipulate to

3      their authenticity?  I just

4      don't want to have to go

5      through the authentication

6      steps.

7              MR. WIENER:  We are

8      agreed.

9              MR. PARONICH:  Thank

10     you.

11         Q.  Mr. Tebeau, it is a document

12 that New York Life produced in connection

13 with this litigation.  It has been marked

14 as Exhibit 2.  Do you recognize it?

15         A.  I do.

16         Q.  Mr. Tebeau, I am not going to

17 ask you specific questions about this

18 document, because it is a contract and it

19 speaks for itself.  What I will ask you,

20 please take as much time as you need to

21 review it, my question is:  Would every

22 PTAS and TAS agent need to sign this

23 contract?

24         A.  Yes, they would.

25         Q.  Would every agent of any

Page 47

1                 C. Tebeau                    47

2    level coming into work with New York Life

3    need to sign this contract?

4         A.  Not necessarily the

5    introductory contract.  Anybody new to

6    the business they would need to sign a

7    contract.

8         Q.  So thank you for that.  I

9    appreciate that.  It is a perfect segue

10   to my next question.

11            What is the significance of the,

12   you know, introductory contract as

13   opposed to others?

14        A.  Yeah, this kind of goes back

15   to what we spoke about with TAS training

16   allowance, so a PTAS then a TAS agent

17   they are entitled to training allowance

18   over a three-year period.  So that, yeah,

19   that is the only significant difference

20   between the contracts.  The agent's

21   responsibilities are the same.  It is

22   just the entitlements are a little

23   different.

24        Q.  The introductory contract is

25   that only for PTAS employees or would

1                 C. Tebeau                    48

2    sometimes TAS employees sign those as

3    well?

4                    MR. WIENER:  Objection

5       to the form.

6                    You could answer.

7          A.  You don't go directly to TAS,

8    so you have to start with PTAS.

9          Q.  Understood.  That is it for

10   that document.  Thank you.

11            Mr. Tebeau, earlier we talked

12   about the steps New York Life has in

13   place to ensure telemarketing law

14   compliance and specifically we talked

15   about the Gryphon system.

16         A.  Um-hum.

17         Q.  My question for you is:  Are

18   you aware of any instances where New York

19   Life has terminated a relationship with

20   an agent because of their failure to

21   comply with the process New York Life has

22   in place for ensuring telemarketing

23   compliance?

24                    MR. WIENER:  Objection

25       to both, the form and as being

1              C. Tebeau                    49

2      outside of the scope.  I don't

3      believe that there is anything

4      in here that asks about any

5      steps New York Life had taken

6      with respect to specific

7      employees.  Perhaps you can

8      link that.

9                MR. PARONICH:  It

10     doesn't, but I think it

11     certainly falls in the scope of

12     efforts to ensure TCPA

13     compliance because if they are

14     aware, and my questions may not

15     get there, but I think if there

16     is a scenario where New York

17     Life was specifically aware of

18     multiple employees flagrantly

19     violating the Gryphon system

20     that they have in place I think

21     that could relate to ensure

22     TCPA compliance.

23                MR. WIENER:  I am not

24     instructing the witness not to

25     answer, but I am -- let's see

1              C. Tebeau              50

2       where it goes because I do have

3       some concerns about employee

4       confidentiality issues.  I

5       don't know that you are going

6       there.

7              MR. PARONICH:  Do you

8       want to call balls and strikes

9       on the questions then?

10             MR. WIENER:  Yeah,

11      okay.

12             MR. PARONICH:  Fair

13      enough.

14         Q.  I would be kind of happy to

15   repeat or rephrase.

16         A.  If you don't mind.

17         Q.  My question is:  Are you

18   aware of any instance where New York Life

19   has terminated its relationship with

20   agents who are engaging in telemarketing

21   outside of the New York Life standards?

22             MR. WIENER:  Objection

23      to the form.

24             You can go ahead and

25      answer.

```
 1              C. Tebeau              51
 2         A.  I am not specifically aware
 3    of agents having been terminated
 4    specifically for that issue, you know, I
 5    am aware -- I couldn't name names, but I
 6    am aware of situations where agents had
 7    been disciplined.
 8         Q.  Sure, I am not going to ask
 9    you to name names.
10         Could you give me an example of
11    one of those discipline issues you are
12    talking about?
13         A.  Yeah, the one I can think
14    of -- again I don't know names.  An issue
15    came up with an agent having contacted
16    someone on a do not call list and the
17    agent was, you know, either reprimanded
18    or severely reprimanded, may have been
19    fined.  I couldn't tell you with
20    certainty, but, yes, disciplined in
21    response to that violation.
22         Q.  Understood.  Thank you.
23         So that circumstance the call
24    would have been placed outside of the
25    Gryphon system; is that correct?
```

1                   C. Tebeau                52

2              A.  It would have had to have

3      been, yes.

4              Q.  So that is all I have for

5      that.  Thank you.

6              Are PTAS or TAS agents allowed to

7      hire third-party vendors?

8              A.  They are not.

9              Q.  Is there a process for a PTAS

10     agent to approach a superior to say "I

11     have an idea for a third-party vendor,

12     can New York Life authorize it"?

13             A.  I am not sure so much a

14     process, but I would like to believe that

15     relationships in offices are such that

16     that type of open dialogue should happen

17     both between an agent and a recruiter

18     and/or with other employees in that

19     general office.

20             Q.  Fair point.  I understood.  I

21     might have asked a confusing question.  I

22     want to make sure we are on the same

23     page.

24             The PTAS or TAS agent does not

25     have the authority to go in, to simply

1                     C. Tebeau                    53

2     choose a vendor of their own and hire

3     them?

4             A.  Oh, no, no, sorry.

5             Q.  I think you did answer my

6     question.  I just wanted to make sure we

7     were on the same page.

8             A.  Okay.

9             MR. PARONICH:  Exhibit

10        3 is next.  It is the Agent

11        Registered Representative's

12        Handbook.

13            (Whereupon, a Handbook was

14    received and marked as Plaintiff's

15    Exhibit 3 for identification as of this

16    date, by the reporter.)

17            MR. WIENER:  We

18        stipulate to the authenticity

19        that it is certain pages of the

20        Agent's Handbook that we have

21        produced in December, right?

22            MR. PARONICH:  Understood.  I

23        am certainly not suggesting that we

24        asked for or want the other pages.

25            Q.  Mr. Tebeau, do you recognize

1                   C. Tebeau                    54

2    this document?

3           A.   I do.

4           Q.   Could you explain to me in

5    our own words what it is?

6           A.   The handbook is basically an

7    accumulation of rules, requirements,

8    directions provided to agents as a go to

9    for them if they want to look at how to

10   document or go online as opposed to

11   talking to a manager in their office.  It

12   is basically a go to for the rights and

13   wrongs of their job.

14          Q.   When are these given to

15   agents?

16          A.   Agents have access to them

17   immediately upon hire.  During the hiring

18   process they get access to it.

19          Q.   Even before they start NYLIC

20   they have access to this document?

21          A.   Yes, it is actually part of

22   their contract.  They sign off

23   acknowledging that they have gotten

24   access to it.

25          Q.   This document, this handbook,

1                    C. Tebeau                    55

2    excuse me, it does layout New York Life's

3    telemarketing compliance protocols?

4              A.   It does.

5              MR. WIENER:   Objection

6         to the form.

7              Q.   Mr. Tebeau, on the second

8    page in this packet, it is page one on

9    two of the handbook, there is a section

10   entitled "Sanctions for Non-Compliance",

11   do you see that?

12             A.   I do.

13             Q.   Earlier when you were

14   mentioning an issue with respect to an

15   agent violating the telemarketing policy,

16   is the sanction that was issued in

17   compliance within this section?

18             MR. WIENER:   Objection

19        to the form.  Mr. Paronich,

20        section three, as you will

21        note, appears above the section

22        relating to telemarketing and

23        refers to the section before

24        the telemarketing section.  It

25        is part and parcel of a

1             C. Tebeau                    56

2      separate provision of the

3      handbook.

4             MR. PARONICH:  Understood.

5      So is that an objection or the

6      answer is just  no?

7             MR. WIENER:  It is an

8      objection to your question.  I

9      am just pointing out the

10     clarification that you are

11     referring to a sanction for

12     non-compliance but it is not

13     non-compliance necessarily in

14     relation to the telemarketing

15     rules.  My objection to the

16     form is I believe that you are

17     assuming facts not in evidence

18     in that you are assuming that

19     non-compliance relating to

20     non-compliance of telemarketing

21     rules when the provision here

22     relates to a different

23     provision in the handbook.

24             MR. PARONICH:  Okay.

25             MR. WIENER:  Can you

1               C. Tebeau                    57

2        answer the question?

3             A.   This section, again, applies

4    to a different function entirely.

5             Q.   Okay.

6             A.   So the penalties and fines

7    here relate to a completely different

8    process.

9             Q.   Understood.  Fair enough.

10            Is there in the agent handbook or

11   otherwise a policy at New York Life for

12   sanctions for violating the telemarketing

13   guidelines of New York Life?

14            A.   It doesn't appear that it

15   specifically lays out penalties that

16   would apply to an agent.

17            Q.   Outside of the handbook are

18   you aware of any policy at New York Life

19   that would cover the same?

20            A.   I am not aware of a written

21   policy.  You know, we do have what we

22   call our disciplinary action process, you

23   know, violations that are not repeated

24   that may happen once in a long while are

25   basically handled on a an ad hoc basis.

1                  C. Tebeau                    58

2    Employees within agency standards would

3    discuss and assess the level of

4    discipline that maybe appropriate in

5    response to a violation that is not

6    specifically outlined in the handbook.

7              Q.  Understood.

8              MR. PARONICH:  We have

9         been going for a little while

10        we can take a break.

11             MR. WIENER:  Okay.

12        (A short recess was taken.)

13             MR. PARONICH:  The next

14        exhibit, please.

15             (Whereupon, a Field News was

16   received and marked as Plaintiff's

17   Exhibit 4 for identification as of this

18   date, by the reporter.)

19             Q.  So, Mr. Tebeau, you have been

20   handed a document that New York Life

21   produced in this case that has been

22   marked as Exhibit 4.  That is your name

23   on the from line; is that correct?

24             A.  Yes, it is.

25             Q.  Could you explain to me what

1                      C. Tebeau                    59

2      this document is?

3            A.   It is, as I said, a Field

4      News, basically it is published, in this

5      case, to all agents and field managers,

6      and Field News is basically designed to

7      make the field aware of a topic, an

8      issue, that they need to be aware.  In

9      this case an issue that had come up in

10     the industry on do not call that we

11     wanted to raise their awareness of their

12     obligation and responsibilities to

13     comply.

14                  MR. PARONICH:  Off the

15        record.

16            (A discussion was held off the

17     record.)

18            Q.   So it says, "To:  Agents and

19     field management".  That would include

20     PTAS and TAS agents?

21            A.   Yes.

22            Q.   And others of course,

23     right?

24            A.   Yeah.

25            Q.   So Mr. Hariri would have been

1                  C. Tebeau                    60

2    a recipient of this communication?

3                  MR. WIENER:  Objection

4       to the form of the question.

5            A.  Well, I think when this was

6    published he wasn't yet here, so I think

7    this proceeds his starting with the

8    company.

9            Q.  Very fair response.

10           Mr. Hariri's position at the

11   company would have -- is a recipient of

12   such communications from New York Life;

13   is that correct?

14           A.  Yes, yes, that is fair,

15   yes.

16                  MR. PARONICH:  Onto our

17      last exhibit which is the Do

18      Nots.  We will mark this as

19      Exhibit 5, please.

20           (Whereupon, a Do Nots Policy was

21   received and marked as Plaintiff's

22   Exhibit 5 for identification as of this

23   date, by the reporter.)

24           Q.  So, Mr. Tebeau, is this a

25   document that you are also familiar with

1                  C. Tebeau                    61

2    from your work in the agency standards

3    department?

4              A.  Yes, it is.

5              Q.  Could you explain to me what

6    it is?

7              A.  It is a document that was

8    created last year in 2016 basically in

9    response to, you know, awareness that

10   there was a potential gap for brand new

11   people coming on board regarding the do

12   nots.  And this basically gave anyone

13   before they sign a contract exposure to

14   all of the do nots.

15             Q.  Is this an example of a

16   business practice that New York Life

17   changed following the filing of this

18   lawsuit?

19             A.  It is, yes.

20             Q.  How is it administered?

21             A.  There is, you know, I will

22   try to make it as straightforward as

23   possible.  In the contracting process

24   there is a list of documents that are

25   required in order for someone to be, you

1                    C. Tebeau                    62

2    know, to go live in a system.  So this is

3    one of those documents that needs to be

4    received in order for that switch to be

5    flipped.  The document itself is

6    available to general offices on agency

7    portal.  They would simply go online,

8    print it off, the agent would review it,

9    have an opportunity to ask questions

10   locally, but basically check the boxes,

11   confirming that they understand each of

12   these rules and the document would then

13   be scanned, uploaded into their

14   electronic contract file.

15            Q.  Is it fair to say then before

16   a new employee could do anything on

17   behalf of New York Life they would need

18   to fill out this document?

19            A.  That is correct.

20            Q.  I don't mean to be obtrusive

21   about that, but I think you mentioned

22   that this even proceeds the signing of

23   the contract; is that right?

24            A.  Their contract, their

25   contract can't be activated.  It could be

```
 1                    C. Tebeau                63
 2    that they signed it, they are not
 3    approved to act on behalf as an agent
 4    until it is on file.
 5            Q.  Which would include logging
 6    into any New York Life system or portal;
 7    is that correct?
 8            A.  Correct, correct.
 9            Q.  Thank you.  So we are all set
10    with that.
11            Are you aware of a company called
12    Live Transfers?
13            A.  Only in the context of this
14    case.
15            Q.  Fair enough.  I will try to
16    keep my questions to the context of this
17    case.
18            Has New York Life itself ever
19    engaged Live Transfers in a business
20    relationship?
21            A.  Not to my knowledge, no.
22            Q.  Are you aware if New York
23    Life ever approved Mr. Hariri to engage
24    Live Transfers in a business
25    relationship?
```

1                    C. Tebeau                    64

2          A.  Did not.

3          Q.  I asked my question poorly.

4    I will rephrase it.

5          A.  Okay.

6          Q.  Are you aware if New York

7    Life ever approved Mr. Hariri engaging

8    Live Transfers?

9              MR. KLATELL:  Do you

10       mean home office employees?

11             MR. PARONICH:  Yes.

12         A.  Right, the corporate we.  We

13   have never approved for him or anyone

14   else that type of relationship.

15         Q.  Understood.

16         Are you aware of any other New

17   York Life agents that have entered into

18   an agreement with Live Transfers other

19   than Mr. Hariri?

20         A.  No, no.

21         Q.  Sir, one of the last topics

22   today, Mr. Tebeau, as it relates to New

23   York Life compliance efforts.  I would

24   like to talk about the process for any of

25   New York Life's handling any

```
1              C. Tebeau                65
2    telemarketing related complaints that
3    came into the office.
4         A.  Okay.
5         Q.  If an individual contacts New
6    York Life and said, "I received a
7    solicitation call and I was on the do not
8    call list", is there a specific
9    department or individual that handles
10   that compliance?
11              MR. WIENER:  Objection
12       to the form of the question.
13        A.  Yeah, there are procedures
14   that cover any complaints coming into the
15   company.  Yes, they are well documented.
16   There is a corporate compliance
17   department has a specific division that
18   deals with complaints.
19        Q.  Understood.  So thank you,
20   that is the heart of what I was trying to
21   get at.
22        A.  Okay.
23        Q.  This corporate compliance
24   complaint department is there a division
25   that just relates to telemarketing?
```

1               C. Tebeau                66

2          A.  No, they deal with all

3    customer complaints.

4          Q.  A part of their job

5    responsibilities would also include any

6    complaint relating to telemarketing?

7          A.  Any complaint that comes in

8    they would be the starting point.

9          Q.  Prior to the filing of this

10   lawsuit are you aware of New York Life

11   receiving complaints in that department

12   relating to Mr. Hariri telemarketing with

13   Live Transfers?

14          A.  No.

15          Q.  So we just covered the do not

16   policy acknowledgement and that was

17   enacted as a result of this lawsuit.

18          My question is:  Are there any

19   other similar procedures that have been

20   enacted as a result of this lawsuit?

21          A.  Yes, there are a couple of

22   other efforts that I think make sense in

23   this context.  I think the last exhibit

24   that you may have a series of blast

25   e-mails that go out to the field, that go

1                C. Tebeau                67

2    out in my name, those have gone out the

3    last three quarters and are planned

4    quarterly going forward.  That is again

5    to put the rules and requirements in

6    every agents and managers face reminding

7    of what the rules are and also providing

8    links back to Field News that we talked

9    about and back to the handbook that we

10   also discussed.

11              MR. WIENER:  Just a

12        point of clarification, these

13        were a part of the supplemental

14        production that I made to

15        you.

16              MR. PARONICH:  I know

17        exactly what he is talking

18        about.

19        Q.  Just to be clear, because I

20   have seen one of the exhibits we looked

21   at earlier was a memo with your name on

22   it that was a reminder on do not call

23   regulations.  That was from before this

24   lawsuit.  Is that what you are talking

25   about e-mail blasts that occurs more

```
1                C. Tebeau                  68

2    frequently as a result of the filing of

3    this?

4          A.   They refer back to that Field

5    News, but, yes, they are current.   Any

6    agent would receive them.

7          Q.   Is it fair to say that, I

8    think these are, in fact, were your

9    words, the idea with that effort it is to

10   put the rules and regulations in the

11   agent's face and remind them of it?

12         A.   Yes, yes, that is correct.

13              MR. PARONICH:   Mr. Tebeau, I

14      do not have any further questions at

15      this time.  I thank you for your

16      presence here.

17              MR. WIENER:   I have a

18      few follow-up.  Let's just take

19      two minutes.

20         (A short recess was taken.)

21   EXAMINATION CONDUCTED BY

22   MR. WIENER:

23         Q.   Mr. Tebeau, I would like to

24   refer you back to the document that has

25   been marked for identification as
```

```
 1                C. Tebeau              69
 2   Plaintiff's Exhibit 5.  It is the do not
 3   checklist.  Do you have that in front of
 4   you?
 5           A.  I do.
 6           Q.  Mr. Tebeau, to whom has this
 7   document been sent?
 8           A.  Okay.  It is basically a two
 9   part process.  In -- one of the responses
10   to this lawsuit was an effort to get this
11   information in front of everyone, so
12   every agent and manager in place at the
13   time is required to review and sign off
14   on this and then every agent and manager
15   hired going forward.  So I should have
16   been clearer on that.  It is not everyone
17   just going forward, it is everyone who
18   has been an agent as well.
19           Q.  Mr. Tebeau, are there
20   individuals who have -- there are
21   individuals who have completed, signed
22   and returned this; is that correct?
23           A.  That's correct.
24           Q.  Are there individuals who
25   have not?
```

Page 70

```
 1                    C. Tebeau                    70
 2           A.   Yes.
 3           Q.   Is there a consequence for
 4      not signing and returning this
 5      document?
 6           A.   There is.  People who have
 7      not signed and returned the document have
 8      been suspended and that is basically, you
 9      know, the process.  Well, there wouldn't
10      need to be a process going forward.
11      Anyone who doesn't complete it who was on
12      the rolls has been suspended and will not
13      be brought back, if ever, until they
14      completed it.
15           Q.   What does it mean to be
16      suspended?
17           A.   They are not allowed to do
18      business.  Their application, if they
19      solicited applications, will not be
20      accepted.  They will not be paid.
21      Basically they will earn nothing from New
22      York Life until it has been completed.
23           Q.   And a condition of ongoing
24      employment with New York Life and able to
25      write business, earn income from New York
```

1                    C. Tebeau                71

2     Life, is contingent upon each employee

3     current and going forward signing, dating

4     and returning the do not checklist that

5     relates to telemarketing?

6              A.   That's correct.

7              Q.   Thank you.

8              Mr. Tebeau, you were asked a

9     question in connection with item four on

10    the Deposition Notice that has been

11    marked for identification as Plaintiff's

12    Exhibit 1.  Remedial steps, we talked

13    about the do not checklist remedial steps

14    being the quarterly e-mails, are there

15    any other remedial steps that New York

16    Life has taken following the lawsuit that

17    is the subject of today's deposition?

18             A.   Yes, there is one other

19    remedial step it is in progress.  That is

20    enhancing the section in the agent

21    registered rep handbook, basically it is

22    to be more expansive, to get into more

23    detail, take the learning experience from

24    this process and make it even less

25    possible for someone not to understand

1                C. Tebeau                    72

2    what the rules are.

3                    MR. WIENER:  I have

4        nothing further for the

5        witness.

6                    MR. PARONICH:  I have

7        no redirect.  Thank you.

8                    MR. WIENER:  I do not

9        waive reading and signing.

10       Thank you.

11

12

13

14

15            (Whereupon, the Jurat is

16    continued on following page.)

17

18

19

20

21

22

23

24

25

```
 1                    C. Tebeau                    73

 2

 3          (Whereupon, the proceedings were

 4      concluded at 11:13 a.m.)

 5

 6

 7

 8

 9

10                    _____

11                    CHRISTOPHER TEBEAU

12

13

14

15

16  Subscribed and sworn to before me this

17  _____ day of _____, 2017.

18  _____

19      NOTARY PUBLIC

20

21

22

23

24

25
```

1              C. Tebeau                    74

2

3              I N D E X

4

5  EXAMINATION BY                      PAGE

6

7  MR. PARONICH                          6

8  MR. WIENER                           68

9

10

11

12            INSERTIONS

13       Page        Line

14

15            (NONE)

16

17

18            RULINGS

19       Page        Line

20

21            (NONE)

22

23

24

25

```
 1              C. Tebeau                75

 2

 3

 4              EXHIBIT INDEX

 5            CHRISTOPHER TEBEAU

 6

 7    NO:          DESCRIPTION:    PAGE:   LINE:

 8

 9    1        Deposition Notice  10      6

10    2        Contract           46      19

11    3        Handbook           53      13

12    4        Field News         58      15

13    5        Do Nots Policy     60      20

14

15

16

17

18

19

20

21

22

23

24

25
```

1                 C. Tebeau                    76

2                   CERTIFICATION

3

4        I, SONYA OWEN, hereby certify that

5    the within was held before me on the 6th

6    day of January, 2017.  That the testimony

7    was taken stenographically by myself.

8    That the within transcript is a true and

9    accurate record.  That I am not connected

10   by blood or marriage with any of the

11   parties.  I am not interested directly or

12   indirectly in the matter in

13   controversy.

14       IN WITNESS WHEREOF, I have hereunto

15   set my hand this 17th day of January,

16   2017.

17

18

19   _____

20       SONYA OWEN

21

22

23

24

25

```
1                    C. Tebeau                    77

2

3                      ERRATA SHEET

4    PAGE/LINE                  CORRECTION

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18

19                          _____

20                          CHRISTOPHER TEBEAU

21

22   Subscribed and sworn to before me this

23   _____ day of _____, 2017.

24   _____

25       NOTARY PUBLIC
```

**A**

**a.m** 1:14 73:4
**ABANTE** 1:5
**able** 27:22 70:24
**above-entitled**
  1:18
**Absolutely**
  39:20
**accepted** 70:20
**access** 22:11
  30:17 32:19
  37:11,12 40:12
  54:16,18,20,24
**accompanied**
  4:6
**accounting**
  11:16
**accumulation**
  54:7
**accurate** 76:9
**acknowledge...**
  66:16
**acknowledging**
  54:23
**act** 63:3
**action** 1:18 4:20
  57:22
**actions** 15:11
**activated** 62:25
**activities** 31:15
  31:24
**ad** 28:25 57:25
**add** 40:3 43:11
**address** 6:13
**adequate** 12:24
**administered**
  61:20
**advance** 23:7
**advanced** 33:6
**against-** 1:8
**agency** 16:22,24
  17:9,10,11,12
  17:16,17 18:5
  19:7 20:25
  22:9,12 24:8
  39:13 40:12
  43:6 58:2 61:2
  62:6
**agent** 26:25 27:5

27:11,14,15,17
28:4,9,16 29:5
29:18 31:11,12
35:22,22 36:9
36:11 37:12,24
38:22 40:10,12
42:12,15,23
43:17 45:10
46:22,25 47:16
48:20 51:15,17
52:10,17,24
53:10 55:15
57:10,16 62:8
63:3 68:6
69:12,14,18
71:20
**agent's** 47:20
  53:20 68:11
**agents** 14:16,16
  15:12 16:12,16
  18:10,23 19:4
  27:7 32:15
  33:14 36:6
  37:20 40:17,21
  41:22 42:14
  50:20 51:3,6
  52:6 54:8,15
  54:16 59:5,18
  59:20 64:17
  67:6
**agreed** 3:5 46:8
**agreement** 7:4
  64:18
**ahead** 34:3 37:7
  38:6 42:8 45:2
  50:24
**allegation** 25:9
**allowance** 31:20
  31:25 36:17,21
  47:16,17
**allowed** 52:6
  70:17
**ambiguous** 35:3
**Americas** 1:12
  2:13
**amount** 31:13
**and/or** 3:10
  52:18
**answer** 3:12,17

3:24 4:5,6,6,8
7:24 9:8 15:17
22:14 34:4
37:8 38:7 42:9
45:3,5 48:6
49:25 50:25
53:5 56:6 57:2
**answered** 4:3,14
**answers** 16:4
**Anthony** 2:8
  7:13
**Anybody** 47:5
**apologize** 30:21
**appear** 57:14
**appears** 55:21
**application**
  28:22 29:11
  45:12 70:18
**applications**
  70:19
**applies** 57:3
**apply** 3:13 57:16
**appreciate** 7:24
  47:9
**approach** 28:20
  29:22 52:10
**appropriate**
  3:13 26:18
  58:4
**appropriately**
  45:10
**approval** 29:16
  29:21 30:3,3,6
  30:9 37:2
**approvals** 30:6
**approve** 29:25
**approved** 30:13
  63:3,23 64:7
  64:13
**areas** 12:21
**Article** 3:14
**ASBILL** 2:11
**asked** 39:18
  44:15,25 52:21
  53:24 64:3
  71:8
**asks** 49:4
**assess** 58:3
**assistant** 12:8

17:19 19:9,20
**Associate** 2:21
**assume** 7:20
  9:11 28:19
**assumed** 43:11
**assuming** 56:17
  56:18
**attend** 17:22
  27:20 31:5
**attendance** 3:21
**attorney** 3:18
  4:4,11,25 5:6
**attorney/client**
  9:13
**attorneys** 2:5,12
  3:6 7:14 9:17
  22:18 23:9
  24:21 25:17
**audit** 13:5 17:25
**auditing** 12:9,19
**auditor** 12:8,18
  13:13
**audits** 12:22
  13:17 14:3
  15:20
**authentication**
  46:5
**authenticity**
  46:3 53:18
**authority** 52:25
**authorize** 52:12
**automatically**
  40:11
**available** 21:23
  22:8 62:6
**Avenue** 1:12
  2:13
**aware** 21:20
  48:18 49:14,17
  50:18 51:2,5,6
  57:18,20 59:7
  59:8 63:11,22
  64:6,16 66:10
**awareness** 59:11
  61:9

**B**

**b** 3:10 6:2
**B-O-U-B-E-R...**

26:14
**Bachelor** 11:15
**back** 18:16
  32:22 45:6
  47:14 67:8,9
  68:4,24 70:13
**background**
  11:4,7
**bad** 7:18
**balls** 50:8
**bar** 4:19
**Bardia** 24:5
**based** 36:18
**basic** 33:4
**basically** 12:8,20
  12:23 13:25
  15:20 22:10
  27:14,18 37:14
  54:6,12 57:25
  59:4,6 61:8,12
  62:10 69:8
  70:8,21 71:21
**basis** 3:19 4:7
  34:19 57:25
**becoming** 27:17
  36:10
**behalf** 1:5 4:25
  9:25 62:17
  63:3
**belabor** 39:16
**believe** 12:7
  14:24 17:17
  44:4 49:3
  52:14 56:16
**Berner** 11:10
**best** 9:7
**bit** 32:23 36:22
**blast** 66:24
**blasts** 22:3 67:25
**block** 39:3
**blood** 76:10
**board** 61:11
**boss** 26:9,15
**Boston** 2:7
**bottom** 10:17
**Boubert** 26:14
**boxes** 62:10
**brand** 61:10
**break** 9:5,9

58:10
BRENNAN 2:11
brick 14:13
brings 43:17
broad 34:22
BRODERICK
  2:4
Brooklyn 11:18
  17:23
brought 70:13
building 14:14
business 15:14
  23:5 26:22
  28:11,21 31:14
  31:15,24 35:14
  35:18 37:2
  39:24 40:18,22
  41:23 42:4
  43:18 44:20
  45:8 47:6
  61:16 63:19,24
  70:18,25

C
c 2:3 3:10 6:1,2
  7:1 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1

call 22:9 28:2
  29:15 30:4,19
  39:4,11,23,24
  40:4,10 50:8
  51:16,23 57:22
  59:10 65:7,8
  67:22
called 11:10
  12:7 13:24
  14:7 36:8
  37:13 45:14
  63:11
calls 35:13,17,21
  36:25 37:25
candidate 29:5
  29:14
candidates
  29:23
capacity 9:25
cared 24:18
case 7:15 9:18
  58:21 59:5,9
  63:14,17
categories 27:6
cause 4:4
caveat 9:6
certain 29:23
  42:12 45:9
  53:19
certainly 21:24
  33:3 49:11
  53:23
certainty 51:20
certification 5:4
  76:2
certify 76:4
change 13:14
  19:10 20:8
changed 61:17
charge 5:8 29:24
check 62:10
checklist 69:3
  71:4,13
choose 53:2
Christopher
  1:19 6:12
  73:11 75:5
  77:20
circle 32:21

circumstance
  51:23
clarification
  56:10 67:12
clarify 35:6
classes 27:20
  32:19
clean 26:24
clear 3:18 4:7
  34:14,23 38:9
  42:25 43:4,13
  67:19
clearer 44:16
  69:16
clearly 4:16
clients 18:24
close 8:9
code 38:22,23,24
college 12:12,13
  12:15
come 27:18,24
  59:9
comes 36:5 45:8
  66:7
coming 28:12
  30:15 44:8
  47:2 61:11
  65:14
comments 3:21
commissions
  31:20 42:16
commitments
  27:24
committed
  27:19
communicating
  4:12
communication
  4:12,15 60:2
communicatio...
  18:12 20:12,14
  21:19,25 23:5
  60:12
company 1:9,17
  2:22 12:23,25
  13:4 24:20
  60:8,11 63:11
  65:15
complaint 25:10

65:24 66:6,7
complaints 65:2
  65:14,18 66:3
  66:11
complete 4:8
  70:11
completed 11:8
  11:9 69:21
  70:14,22
completely
  15:19 37:9
  57:7
compliance 3:6
  13:8,22 14:3
  14:22 15:5,10
  15:22 16:19
  17:5 21:3,14
  21:24 41:11
  44:7 48:14,23
  49:13,22 55:3
  55:17 64:23
  65:10,16,23
complies 37:16
comply 21:22
  48:21 59:13
computer 11:16
  33:9
concerns 50:3
concluded 73:4
condition 70:23
CONDUCTED
  68:21
conducting
  13:17
confidentiality
  50:4
confirm 10:21
  15:22 43:19
  45:13
confirming
  62:11
conflicting
  31:15
confusing 52:21
connected 76:9
connection 9:18
  46:12 71:9
consent 4:12
consequence

70:3
considering
  27:17
contacted 40:2
  51:15
contacts 65:5
context 9:21
  12:11 63:13,16
  66:23
contingent 71:2
continued 72:16
contract 28:3,4
  32:2 36:18
  37:24 42:20
  45:19 46:18,23
  47:3,5,7,12,24
  54:22 61:13
  62:14,23,24,25
  75:10
contracting
  61:23
contracts 29:25
  30:2 47:20
controlled 5:2
controls 12:24
  45:7
controversy
  76:13
conversation
  7:18 8:21
conversations
  9:14 25:16
  26:3,16
copy 5:7
corporate 9:25
  13:8,21 14:22
  17:5,20 19:24
  20:2,4,6 64:12
  65:16,23
correct 17:9
  19:8 21:12
  25:14 32:8,9
  36:15 38:12,14
  38:15 43:2,3
  51:25 58:23
  60:13 62:19
  63:7,8,8 68:12
  69:22,23 71:6
CORRECTION

77:4
**counsel** 1:23
2:21 5:7 6:24
**county** 14:2,13
**couple** 13:6,12
19:14 21:17
66:21
**course** 3:20 9:20
41:24 59:22
**court** 1:2,22 4:2
7:16 10:10
**Courts** 3:7
**cover** 8:19 22:23
30:23 34:5
57:19 65:14
**covered** 15:8
33:5,7 34:18
66:15
**covering** 28:17
**CPLR** 3:14,19
4:5 5:2
**created** 33:15
61:8
**credentials**
37:20
**criminal** 29:19
**cross** 17:21
**current** 68:5
71:3
**currently** 16:22
17:20
**customer** 43:5,8
43:20 44:8,21
66:3

———————
**D**
**d** 3:10 74:3
**date** 10:9 45:22
53:16 58:18
60:23
**dating** 71:3
**day** 19:16,16
73:17 76:6,15
77:23
**day-to-day**
13:20 18:8
20:7 31:22
**deal** 66:2
**deals** 65:18

**December** 53:21
**defect** 3:18
**Defendant** 1:10
1:17 2:12
**defined** 23:14
**degrees** 11:13
**department**
12:10,19,21
13:7,9 14:23
16:19,21 17:8
17:10 19:7
21:2 61:3 65:9
65:17,24 66:11
**depend** 29:19
**deponent** 3:17
3:24 4:5,7,12
**deposition** 3:11
3:11,12,16,24
4:9,11 7:8,16
10:6,14 23:8
24:22 35:7
42:22 71:10,17
75:9
**DESCRIPTION**
75:7
**designated**
21:11
**designed** 33:2
37:15 59:6
**desks** 14:15
**detail** 16:3 71:23
**detailed** 22:8
**determining**
4:13
**developed** 38:12
**developing** 8:6
**dial** 38:21,25
39:2
**dialing** 38:19
**dialogue** 52:16
**difference** 26:25
31:21 47:19
**different** 12:20
13:6 15:3,10
16:18 19:18
21:17 27:6,11
29:16,21 40:8
47:23 56:22
57:4,7

**difficult** 18:16
30:16
**digit** 38:23
**direct** 4:4 19:14
26:9
**direction** 4:6
**directions** 54:8
**directive** 40:17
**directly** 48:7
76:11
**director** 17:18
17:19 18:4
**disciplinary**
57:22
**discipline** 51:11
58:4
**disciplined** 51:7
51:20
**discuss** 25:5
58:3
**discussed** 6:23
67:10
**discussion** 59:16
**DISTRICT** 1:2
1:3
**division** 13:24
17:11,14 65:17
65:24
**document** 10:11
10:12 20:22
46:11,18 48:10
54:2,10,20,25
58:20 59:2
60:25 61:7
62:5,12,18
68:24 69:7
70:5,7
**documentation**
45:13
**documented**
65:15
**documents** 46:2
61:24 62:3
**dramatically**
13:15 19:17
20:9
**duly** 6:3

———————
**E**

**E** 2:3,3 6:2,2,2
74:3
**e-mail** 18:18,20
18:21 22:3
67:25
**e-mails** 18:22
66:25 71:14
**earlier** 35:25
42:15,22 43:11
48:11 55:13
67:21
**earn** 42:17 70:21
70:25
**easiest** 27:15
**educational** 11:6
**effectively** 14:4
**efficient** 13:11
**effort** 68:9 69:10
**efforts** 15:11
21:13 25:6,8
44:6 49:12
64:23 66:22
**eight** 17:6
**either** 12:21
51:17
**electronic** 62:14
**eligible** 31:19
**employed** 11:25
**employee** 27:4,8
27:13 30:12
35:12,16 36:24
38:17 50:3
62:16 71:2
**employees** 16:14
22:19 24:7
25:18,24 26:7
27:2 31:4,8,9
32:7,8,11,14
33:20 39:11
47:25 48:2
49:7,18 52:18
58:2 64:10
**employment**
70:24
**enable** 40:11
**enacted** 66:17
66:20
**engage** 63:23
**engaged** 63:19

**engaging** 50:20
64:7
**enhancing** 71:20
**ensure** 12:24
21:14 25:9
29:6 37:15
41:11 44:6,21
45:7 48:13
49:12,21
**ensuring** 21:3
48:22
**entered** 64:17
**entire** 33:3
**entirely** 57:4
**entitled** 36:17
47:17 55:10
**entitlements**
47:22
**ERRATA** 77:3
**error** 3:19
**ESQ** 2:8,14
**established** 36:8
36:11,19
**event** 4:15
**evidence** 56:17
**exactly** 26:2
67:17
**examination**
1:16 3:20 4:19
4:22,24,25 5:4
5:7 6:7,18
68:21 74:5
**examined** 4:23
5:7 6:4
**examining** 4:8
**example** 18:17
29:22 51:10
61:15
**exception** 38:9
42:25
**exceptions** 43:5
43:13
**exchange** 31:24
**excuse** 55:2
**executing** 25:20
25:25
**exhibit** 10:5,8,11
26:20 45:18,21
46:14 53:9,15

58:14,17,22
60:17,19,22
66:23 69:2
71:12 75:4
**exhibits** 22:2
67:20
**existing** 43:8
**expansive** 71:22
**expectations**
21:21 22:6
**experience**
32:17 71:23
**explain** 18:5
20:25 27:10,16
31:9 40:6 54:4
58:25 61:5
**exposure** 61:13
**extent** 3:19 8:24
23:13
**external** 15:23
16:7

**F**
**face** 67:6 68:11
**facilitate** 21:23
**fact** 68:8
**facts** 56:17
**failure** 4:18,24
48:20
**fair** 8:10,11
23:19 50:12
52:20 57:9
60:9,14 62:15
63:15 68:7
**falls** 49:11
**familiar** 60:25
**far** 18:16
**federal** 15:5
39:4
**field** 13:24 18:9
18:13,15 20:12
20:13 21:20
22:2,4,11 24:9
58:15 59:3,5,6
59:7,19 66:25
67:8 68:4
75:12
**file** 62:14 63:4
**filed** 32:3

**filing** 5:4 61:17
66:9 68:2
**fill** 28:22 62:18
**financial** 12:22
29:20
**fined** 51:19
**fines** 57:6
**finish** 7:23 28:17
**first** 6:3 10:5
11:3,20 12:5
22:17 33:5
**fit** 29:6
**flagrantly** 49:18
**flagship** 14:18
**flexibility** 19:15
36:22
**flipped** 62:5
**focus** 19:19
**focused** 15:11
**follow-up** 68:18
**following** 61:17
71:16 72:16
**follows** 6:5
**foot** 12:16
**form** 3:18 7:2
15:16 23:12
24:14 34:2,11
34:20,24 37:6
38:5 42:6
43:23,24 48:5
48:25 50:23
55:6,19 56:16
60:4 65:12
**formality** 31:17
**forth** 4:2,14
**forward** 67:4
69:15,17 70:10
71:3
**foundation**
24:10
**four** 10:21 25:6
29:4 38:23
40:25 71:9
**framed** 3:17
**frequently** 68:2
**front** 69:3,11
**full** 27:23,25
**full-time** 28:4
**function** 19:19

57:4
**functionally**
19:17
**functions** 18:14
18:17 20:10
**further** 68:14
72:4

**G**
**G-I-L-L** 26:11
26:12
**G-R-Y-P-H-O...**
37:14
**gap** 61:10
**general** 2:21
14:2,5,7,11
52:19 62:6
**generate** 15:13
36:25 39:23
41:23 42:4
**generated** 43:20
**generating**
40:18
**gentleman** 26:13
**geographic** 42:3
42:10
**Gerard** 26:15
**getting** 21:7
36:21
**Gill** 26:10
**give** 11:6 31:23
38:16 43:10
51:10
**given** 3:12 7:8
37:12,13 38:22
40:21 42:3
54:14
**giving** 8:14
31:14 33:18
41:12
**glad** 30:22
**go** 8:17 12:20
14:8 15:9
32:18 34:3
37:7 38:6,25
40:13 42:8
45:2 46:4 48:7
50:24 52:25
54:8,10,12

62:2,7 66:25
66:25
**goes** 32:23 47:14
50:2
**going** 6:24 7:20
8:3 9:4 11:2
23:3 24:2 25:5
27:25 46:16
50:5 51:8 58:9
67:4 69:15,17
70:10 71:3
**good** 24:10
**GOs** 15:10
**gotten** 54:23
**graduate** 31:18
42:17
**graduated** 11:11
11:17 12:15
17:25 36:11
**graduating** 28:2
28:3
**granted** 38:20
**Great** 7:10
11:19
**ground** 7:11
8:16
**grounds** 4:14
**Gryphon** 37:14
37:19 38:2,11
38:19 39:2,7
39:10,22 42:24
48:15 49:19
51:25
**guideline** 41:13
**guidelines** 29:15
57:13

**H**
**H** 6:2,2
**habit** 7:19
**hand** 76:15
**handbook** 53:12
53:13,20 54:6
54:25 55:9
56:3,23 57:10
57:17 58:6
67:9 71:21
75:11
**handed** 58:20

**handled** 57:25
**handles** 65:9
**handling** 64:25
**happen** 40:11
52:16 57:24
**happens** 29:12
30:11 31:17
**happy** 13:18
41:18 44:18
50:14
**hard** 8:6
**Hariri** 23:25
24:3 59:25
63:23 64:7,19
66:12
**Hariri's** 24:6
60:10
**heard** 7:13
**heart** 65:20
**held** 1:19 59:16
76:5
**help** 29:6
**helpful** 27:9
**heres** 41:13
**hereto** 10:22
**hereunto** 76:14
**high** 2:6 11:7,9
11:10
**hire** 29:14 52:7
53:2 54:17
**hired** 29:18
69:15
**hiring** 29:15
54:17
**history** 29:19,20
**hit** 40:10
**hoc** 57:25
**Hollow** 6:16
**home** 30:7 64:10
**housed** 14:16

**I**
**idea** 52:11 68:9
**identification**
10:8 45:21
53:15 58:17
60:22 68:25
71:11
**iii** 4:2

**imbibed** 8:13
**immediately**
  54:17
**important** 8:18
  9:3
**improper** 4:3
**include** 3:18
  16:15 41:12
  59:19 63:5
  66:5
**inclusive** 8:25
**income** 42:2
  70:25
**independently**
  18:15
**INDEX** 75:4
**indirectly** 76:12
**individual** 29:11
  33:10 37:3
  39:21,24 40:3
  65:5,9
**individually** 1:5
**individuals**
  39:18 41:13
  69:20,21,24
**industry** 28:12
  32:17 59:10
**information**
  22:8 69:11
**INSERTIONS**
  74:12
**instance** 43:12
  50:18
**instances** 48:18
**instructing**
  49:24
**insurance** 1:9,17
  28:12,20,21
**intend** 9:12
**interacting**
  20:11
**interactions**
  18:12
**interested** 76:11
**interfere** 3:21
**internal** 15:23
  16:6 39:4,11
**interrupt** 4:11
**interrupting**

7:19 30:21
**interview** 16:14
  29:2,7
**interviews** 29:4
**intimate** 25:2
**introductory**
  47:5,12,24
**involved** 20:11
  25:24
**irregularity** 3:19
**issue** 8:5 51:4,14
  55:14 59:8,9
**issued** 10:15
  55:16
**issues** 29:20 50:4
  51:11
**item** 71:9
**items** 40:25

——————
**J**
——————
**jack** 20:18
**January** 1:13
  76:6,15
**Jeremy** 2:21
  8:22
**job** 11:20 20:7
  20:25 24:7,24
  27:20 54:13
  66:4
**jobs** 29:3,8
**joined** 17:17
**June** 12:4
**Jurat** 72:15

——————
**K**
——————
**keep** 6:24 7:11
  63:16
**kind** 28:16
  30:15 32:10,13
  45:6 47:14
  50:14
**kinds** 32:19
**Klatell** 2:21 9:16
  64:9
**know** 7:20 8:9
  8:21 11:12,13
  12:17 13:6
  14:13 15:23
  16:25 18:11
  19:15 20:9,13

21:19 26:6,14
  27:10 31:16
  34:7,12,16,17
  42:11 47:12
  50:5 51:4,14
  51:17 57:21,23
  61:9,21 62:2
  67:16 70:9
**knowledge**
  24:11 25:2
  63:21
**knows** 38:24

——————
**L**
——————
**L** 3:4
**law** 11:18,21,23
  11:24 17:23
  22:5 45:15
  48:13
**lawful** 43:21
**laws** 15:6
**lawsuit** 61:18
  66:10,17,20
  67:24 69:10
  71:16
**layout** 55:2
**lays** 57:15
**leaning** 19:15
**learn** 27:20
**learning** 71:23
**leave** 22:17
**left** 36:5
**let's** 49:25 68:18
**level** 20:2 28:16
  30:5,6 36:6
  42:16,19 47:2
  58:3
**levels** 27:11
  29:16,21
**LEWIS** 2:14
**license** 28:20
**licensed** 27:22
  30:14 42:12
  45:10
**licensing** 45:7
**Life** 1:9,17 2:22
  10:2 11:6,20
  11:23,25 12:3
  12:6 14:18

16:11 22:20
  23:17,21 24:8
  24:25 25:7,18
  25:24 28:9,22
  29:10 30:25
  33:20 35:14,18
  37:4,24 38:13
  38:17 39:9,17
  41:10,22 43:19
  43:20 44:19
  46:12 47:2
  48:12,19,21
  49:5,17 50:18
  50:21 52:12
  57:11,13,18
  58:20 60:12
  61:16 62:17
  63:6,18,23
  64:7,17,23
  65:6 66:10
  70:22,24 71:2
  71:16
**Life's** 26:22 44:5
  55:2 64:25
**limit** 9:12
**limitation** 4:2
**limits** 42:11
**line** 17:22 41:8
  58:23 74:13,19
  75:7
**link** 22:6,7 49:8
**links** 67:8
**list** 10:17 39:11
  39:15,17 40:4
  51:16 61:24
  65:8
**lists** 39:5
**litigation** 46:13
**little** 20:23 22:13
  26:4 32:23
  36:21 47:22
  58:9
**live** 62:2 63:12
  63:19,24 64:8
  64:18 66:13
**lives** 45:8
**LiveTransfers**
  23:22
**LiveTransfers...**

23:7
**LLP** 2:11
**local** 14:14
  29:13,22
**locally** 62:10
**log** 42:23
**logging** 63:5
**long** 9:5 32:24
  57:24
**longer** 7:22
  36:20 39:25
**look** 45:12 54:9
**looked** 67:20
**looking** 12:23
  15:20 16:6,8
  39:2
**looping** 45:6
**lot** 8:3 15:2
  20:18 33:11
**Lou** 7:5 8:22

——————
**M**
——————
**main** 43:15
**maintain** 39:17
  42:20
**management**
  14:14 59:19
**manager** 19:15
  29:5 54:11
  69:12,14
**managers** 59:5
  67:6
**managing** 29:23
**mark** 60:18
**marked** 10:7,11
  45:20 46:13
  53:14 58:16,22
  60:21 68:25
  71:11
**marriage** 76:10
**Massachusets**
  2:7
**Massapequa**
  11:11
**material** 33:14
**matter** 19:12
  76:12
**mean** 14:10 33:9
  34:23 62:20

64:10 70:15
**meaning** 25:7
**meant** 35:10
**medications**
8:12
**meetings** 16:16
**memo** 67:21
**memory** 17:4
**mentioned**
13:11 30:22
33:17 35:25
42:15,23 62:21
**mentioning**
55:14
**Michael** 26:13
**mind** 12:17
41:20 50:16
**minimum** 42:19
**minimums**
42:14
**minor** 11:16
**minutes** 41:16
68:19
**module** 33:8
34:13,18
**modules** 33:2,12
33:22 34:5,7
**monitoring**
18:18,22 19:3
**months** 33:5
**mortar** 14:14
**motion** 4:19
**move** 4:18 13:19
16:18,23 28:15
**multiple** 49:18

**N**

**N** 2:3,21 3:4
74:3
**name** 6:10 7:13
20:15 23:24
34:16,17 51:5
51:9 58:22
67:2,21
**names** 26:7 34:9
51:5,9,14
**narrow** 16:8
**necessarily** 47:4
56:13

**need** 10:24
11:13 27:22
38:18 42:17
46:20,22 47:3
47:6 59:8
62:17 70:10
**needed** 42:23
**needs** 37:3 62:3
**never** 64:13
**new** 1:3,9,12,12
1:16,21 2:13
2:13,22 6:16
10:2 11:5,11
11:20,22,25
12:2,6 14:18
15:13 16:11
22:19 23:16,21
24:7,25 25:7
25:17,24 26:21
28:8,8,10,21
29:10 30:25
33:19 35:14,14
35:18 37:2,4
37:24 38:13,17
39:9,17,23
40:18,21,21
41:10,22,23
43:20 44:5,7
44:19,20 46:12
47:2,5 48:12
48:18,21 49:5
49:16 50:18,21
52:12 55:2
57:11,13,18
58:20 60:12
61:10,16 62:16
62:17 63:6,18
63:22 64:6,16
64:22,25 65:5
66:10 70:21,24
70:25 71:15
**News** 22:2 58:15
59:4,6 67:8
68:5 75:12
**night** 11:24
**non-compliance**
55:10 56:12,13
56:19,20

**normal** 22:22
**Notary** 1:20
4:23 6:3 73:19
77:25
**note** 55:21
**noted** 3:11
**Notice** 10:6,15
71:10 75:9
**nots** 60:18,20
61:12,14 75:13
**Nova** 11:12
**number** 21:7,16
25:6 30:19
38:21 39:2,14
39:14 40:9,13
**numbers** 39:3
**NYLIC** 30:20
31:3,5 32:6,14
32:22 33:19
36:12 54:19

**O**

**O** 3:4 6:2
**object** 4:18
**objection** 3:16
4:19 15:15
23:11 24:13
33:25 34:10,20
34:25 37:5
38:4 40:23
41:15 42:5
43:22 44:24
48:4,24 50:22
55:5,18 56:5,8
56:15 60:3
65:11
**objections** 3:10
3:13 6:25
**obligation** 59:12
**obtrusive** 62:20
**occur** 25:10
**occurs** 30:9
67:25
**office** 14:11 15:4
28:25 29:13,22
29:24 30:7
33:13 44:9
52:19 54:11
64:10 65:3

**officer** 3:11
**offices** 14:2,6,8
14:15 15:22
30:4 52:15
62:6
**Oh** 53:4
**okay** 7:10,25 8:5
8:23 9:10
11:19 13:5
21:13 24:4
25:12 26:5
28:8,8 29:13
30:8,10,13,24
34:14 35:4,9
40:19 45:16
50:11 53:8
56:24 57:5
58:11 64:5
65:4,22 69:8
**once** 57:24
**ongoing** 22:23
42:19 70:23
**online** 54:10
62:7
**open** 52:16
**operational**
12:22
**opportunity**
62:9
**opposed** 47:13
54:10
**opposing** 6:23
**options** 40:9
**order** 1:22 4:2
29:17 42:17
61:25 62:4
**original** 4:24 5:4
**originated** 44:20
**outbound** 35:13
35:17,21 36:25
37:25 39:22
**outlined** 58:6
**outside** 16:19
31:15,23 39:9
42:7 43:25
44:3 45:14
49:2 50:21
51:24 57:17
**overall** 18:8

**overseeing** 13:16
**overview** 38:17
**OWEN** 76:4,20

**P**

**P** 2:3,3 3:4 6:2
**P.C** 2:4
**packet** 55:8
**page** 10:16,17
10:21 22:16
52:23 53:7
55:8,8 72:16
74:5,13,19
75:7
**PAGE/LINE**
77:4
**pages** 53:19,24
**paid** 31:19 70:20
**parameters**
40:20 42:3
**parcel** 55:25
**Paronich** 2:4,8
6:19,22 7:14
9:19 10:21 21:5
21:12 23:18
24:15 35:4,8
40:24 41:3,7
44:2,17 45:17
45:23 46:9
49:9 50:7,12
53:9,22 55:19
56:4,24 58:8
58:13 59:14
60:16 64:11
67:16 68:13
72:6 74:7
**part** 27:18 31:12
31:16 36:10,13
54:21 55:25
66:4 67:13
69:9
**part-time** 27:15
28:3
**particular** 14:19
**parties** 3:6,9
4:12 76:11
**partner** 29:23
**party** 4:8 38:13
**password** 37:13

penalties 57:6
57:15
people 7:19
13:16 18:13
22:23 61:11
70:6
perfect 8:2 47:9
perform 18:14
period 33:3 36:2
36:15 47:18
periodically
22:4
permitted 3:19
person 3:13 4:4
29:24 33:12
45:8,14
person's 30:2
personally 8:17
persons 3:20
perspective
18:23
phone 39:14
place 1:20 15:21
39:12 40:3
44:10 48:13,22
49:20 69:12
placed 51:24
plainly 4:3
plaintiff 7:15
10:15
Plaintiff's 10:7
25:10 45:20
53:14 58:16
60:21 69:2
71:11
Plaintiffs 1:7 2:5
planned 67:3
please 6:10,13
10:5,20,23
21:15 31:8
38:16 40:7
46:20 58:14
60:19
PLUMBING
1:5
plus 30:3
point 39:16
52:20 66:8
67:12

pointing 56:9
policy 55:15
57:11,18,21
60:20 66:16
75:13
poor 24:16
poorly 64:3
portal 22:9,13
39:13 40:12
62:7 63:6
position 12:5
13:3,19 17:15
18:6 19:11,21
60:10
possible 13:11
61:23 71:25
potential 61:10
potentially 26:3
practice 61:16
practices 26:22
prejudice 4:4
prepare 22:20
22:24
preparing 24:22
presence 68:16
PRESENT 2:20
presented 30:18
preserve 3:25
pretty 24:10
prevent 8:13
previously 39:18
primary 13:23
print 62:8
prior 37:2 66:9
privilege 3:25
9:13
privileges 35:20
Probably 27:15
problem 41:21
procedures
15:21 65:13
66:19
proceed 3:12
proceedings
73:3
proceeds 60:7
62:22
process 29:2,7
40:2 43:18,21

44:10,20 48:21
52:9,14 54:18
57:8,22 61:23
64:24 69:9
70:9,10 71:24
produced 46:12
53:21 58:21
producing 21:19
31:13
production
42:14,19 67:14
program 12:9
33:9
progress 71:19
promotion 19:6
20:3
promotions 13:7
13:12,14
pronounce
23:23
protect 12:25
protocols 55:3
provide 5:7 9:21
12:11 22:7
provided 4:5 5:2
54:8
providing 67:7
provision 3:10
56:2,21,23
provisional 24:6
26:25 27:3,7
27:12
provisions 27:21
PTAS 27:14
28:6,7,9,13,17
30:12 31:4,7
31:11,18 32:7
35:12,22 37:11
37:20 39:10
42:15 46:22
47:16,25 48:8
52:6,9,24
59:20
Public 1:21 4:23
6:4 73:19
77:25
published 59:4
60:6
purpose 4:11,13

33:15
purposes 35:7
pursuant 1:21
3:13
push 9:2
put 22:3 38:23
40:13 67:5
68:10

——————
Q
——————
quarterly 67:4
71:14
quarters 67:3
question 4:2,8
4:13,18 7:23
8:8,20 9:7,8
11:3 15:19
16:4 21:8 23:4
23:12 24:16,19
34:15 35:2
38:5 41:19
42:6 43:23
44:14,25 45:24
46:21 47:10
48:17 50:17
52:21 53:6
56:8 57:2 60:4
64:3 65:12
66:18 71:9
questioning 3:18
3:22 5:6 41:8
questions 3:24
46:17 49:14
50:9 62:9
63:16 68:14

——————
R
——————
R 2:3 6:2,2
raise 59:11
raised 3:16
range 20:16
reading 72:9
real 31:21
Really 19:12
reask 41:19
reason 4:15
receive 68:6
received 10:7
45:20 53:14
58:16 60:21

62:4 65:6
receives 29:10
receiving 66:11
recess 58:12
68:20
recipient 60:2
60:11
recognize 3:9
46:14 53:25
record 4:15 6:11
6:14,21 8:6
26:24 59:15,17
76:9
recruit 14:15
recruited 32:16
recruiter 52:17
redirect 72:7
refer 27:14 68:4
68:24
referring 23:16
27:13 56:11
refers 55:23
refusal 4:6
regarding 61:11
registered 18:10
53:11 71:21
regulations
15:24 16:7
67:23 68:10
regulatory 29:20
relate 15:4 21:2
44:5 49:21
57:7
related 11:3
33:23 34:8
65:2
relates 41:2
56:22 64:22
65:25 71:5
relating 55:22
56:19 66:6,12
relation 56:14
relationship
23:6,22 48:19
50:19 63:20,25
64:14
relationships
52:15
relief 3:13

remainder 4:9
remaining 45:25
remedial 25:8
  25:18 26:17
  71:12,13,15,19
remember 14:21
  26:8
remind 22:4
  68:11
reminder 67:22
reminding 67:6
rep 71:21
repeat 50:15
repeated 57:23
rephrase 23:20
  41:19 44:18
  50:15 64:4
report 12:23
reporter 6:8
  7:17 10:9,10
  45:22 53:16
  58:18 60:23
reporting 19:13
reports 19:14
  26:13
Representativ...
  53:11
reprimanded
  51:17,18
reps 18:11
request 3:17
require 30:2,5
required 29:17
  42:20 61:25
  69:13
requirement
  30:15 32:2
requirements
  54:7 67:5
reserved 4:20
  7:2
respect 15:13
  16:5 19:3 23:4
  26:21 35:21
  40:18,21 41:9
  49:6 55:14
respective 3:6
respond 28:24
response 51:21

58:5 60:9 61:9
responses 69:9
responsibilities
  13:13,21 15:3
  18:6 19:13
  20:7,17 24:7
  24:25 31:22
  43:6 47:21
  59:12 66:5
responsible
  18:19
responsive 8:20
restrictions
  33:23 36:20
result 66:17,20
  68:2
return 4:24
returned 69:22
  70:7
returning 70:4
  71:4
review 10:20
  13:24 20:23
  46:21 62:8
  69:13
right 3:13,25 4:8
  9:9 12:14
  16:10 26:23
  29:6 31:12
  34:17 53:21
  59:23 62:23
  64:12
rights 5:2 54:12
Road 6:15
Rocchi 26:15
Rockwood 6:15
role 13:23 18:8
  19:10
rolls 70:12
room 33:13
ROOTER 1:5
roughly 14:12
rule 3:7,10,20,20
  4:5 8:16
rules 3:7 4:14
  5:2 7:11 15:23
  21:20 22:5
  54:7 56:15,21
  62:12 67:5,7

68:10 72:2
RULINGS
  74:18

S

S 2:3,14 3:4,4
  6:2
sampling 16:15
sanction 55:16
  56:11
sanctions 55:10
  57:12
Sandra 26:9
Sandra's 26:15
says 39:25 59:18
scanned 62:13
scenario 49:16
school 11:7,10
  11:10,18,21,23
  11:24 17:23
science 11:15,16
scope 20:16 42:7
  43:25 44:4
  49:2,11
second 10:16
  22:15 55:7
section 4:14
  55:9,17,20,21
  55:23,24 57:3
  71:20
see 39:14 49:25
  55:11
seen 10:12 22:2
  67:20
segue 47:9
sell 27:23
send 18:23
senior 26:15
sense 66:22
sent 69:7
separate 56:2
series 22:10
  66:24
service 43:5
set 4:2,14 39:3
  63:9 76:15
sets 30:5
seven 17:6
severely 51:18

share 39:9
sharp 36:5
SHEET 77:3
short 41:9 58:12
  68:20
side 9:2
sign 41:14 46:22
  47:3,6 48:2
  54:22 61:13
  69:13
signed 4:22 63:2
  69:21 70:7
significance
  47:11
significant 4:4
  47:19
signing 62:22
  70:4 71:3 72:9
similar 19:2
  66:19
similarly 1:6
simply 52:25
  62:7
Sir 64:21
sits 33:13
situated 1:6
situations 51:6
six 33:5 38:23
skip 7:10
Sleepy 6:15
sole 27:20
solicit 35:14,17
  42:13
solicitation
  42:24 65:7
solicited 39:19
  44:12,22 45:6
  70:19
somebody 28:11
SONYA 76:4,20
sorry 14:9 17:13
  22:17 36:4
  53:4
sort 14:17 27:6
  45:4
SOUTHERN
  1:3
span 33:2
speak 22:19 23:8

24:20
speaking 22:18
speaks 46:19
specific 18:17
  21:9,13 34:8
  34:13 45:11
  46:17 49:6
  65:8,17
specifically 15:8
  22:24 30:17
  48:14 49:17
  51:2,4 57:15
  58:6
spend 41:16
spoke 47:15
spoken 25:17
standards 17:11
  17:12,16,18
  18:5,13 19:7
  20:15 21:2
  24:9 50:21
  58:2 61:2
start 12:2 20:22
  21:18 28:9,13
  37:4 38:18
  48:8 54:19
started 11:22
  14:22 17:16,25
starting 17:7
  60:7 66:8
starts 10:17
state 1:21 6:10
  6:13 15:5 39:4
  42:12 45:9,9
stated 3:16 4:15
statement 3:18
  4:7
statements 3:21
states 1:2 32:3
  42:13
stenographica...
  76:7
step 45:11 71:19
steps 25:8,19,21
  25:25 26:17
  37:3 41:10
  46:6 48:12
  49:5 71:12,13
  71:15

stipulate 46:2
53:18
STIPULATED
3:5
stipulations 1:22
straightforward
61:22
Street 2:6
strike 4:18 32:12
strikes 50:8
subdivision 3:10
4:5
subject 3:12
71:17
Subscribed
73:16 77:22
subsequently
11:17
succinct 4:6
succinctly 3:16
4:15
suggest 3:17
suggesting 53:23
Suite 2:6
superior 52:10
supervision
18:10,20
supervisory 14:3
supplemental
67:13
supporting 18:9
sure 10:19 11:9
11:14 15:2,18
16:2 18:7 21:4
21:6 23:15
26:9,23 27:12
37:9 38:20
41:3,4,6 44:10
51:8 52:13,22
53:6
suspended 70:8
70:12,16
SUTHERLAND
2:11
switch 62:4
sworn 4:23 6:3
73:16 77:22
system 37:13,15
37:19,21 38:2

38:11,12,19,24
39:7,10,22
40:14 42:24
48:15 49:19
51:25 62:2
63:6

T

T 3:4,4 6:2,2
17:21
take 9:4,5,8
10:23 25:7,8
37:3 46:20
58:10 68:18
71:23
taken 1:20 3:11
49:5 58:12
68:20 71:16
76:7
takes 7:17 33:10
talk 23:15 32:22
40:17 64:24
talked 48:11,14
67:8 71:12
talking 27:4
43:12 51:12
54:11 67:17,24
TAS 31:12,18
32:7 33:3
35:16,22 36:2
36:7,24 37:11
39:10 42:18,18
46:22 47:15,16
48:2,7 52:6,24
59:20
TCPA 20:13
21:3,14 34:18
37:16 38:9
41:11 42:25
43:4 44:6
49:12,22
team 14:15
Tebeau 1:19 6:1
6:12,20 7:1,7
8:1 9:1,23 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1,21 21:1

22:1 23:1 24:1
25:1,5 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1,16
41:1 42:1 43:1
44:1 45:1 46:1
46:11,16 47:1
48:1,11 49:1
50:1 51:1 52:1
53:1,25 54:1
55:1,7 56:1
57:1 58:1,19
59:1 60:1,24
61:1 62:1 63:1
64:1,22 65:1
66:1 67:1 68:1
68:13,23 69:1
69:6,19 70:1
71:1,8 72:1
73:1,11 74:1
75:1,5 76:1
77:1,20
telemarketing
15:6 19:4
33:23 34:6,8
34:21,24 48:13
48:22 50:20
55:3,15,22,24
56:14,20 57:12
65:2,25 66:6
66:12 71:5
telephone 35:13
35:17,21 36:25
37:25 39:23
tell 40:25 51:19
ten 24:9
term 23:14
34:21
terminated
48:19 50:19
51:3
terminology
26:23
terms 20:11,12
31:21 36:6,18
45:5

testified 6:4
testify 9:25
10:22 21:11
22:20 25:13
testimony 4:18
8:14 43:10
76:6
thank 13:2
14:20 16:17
18:3 20:20
22:13 32:5
37:17 39:8
40:15 42:21
44:13 46:9
47:8 48:10
51:22 52:5
63:9 65:19
68:15 71:7
72:7,10
Thanks 30:9
thing 9:3
things 12:25
20:19
think 8:2,7,18
15:7 16:25
18:8,16 19:13
19:17 21:25
27:3 34:25
35:8,9,11 44:3
44:15,24 45:4
49:10,15,20
51:13 53:5
60:5,6 62:21
66:22,23 68:8
thinking 43:14
third 10:21 24:5
30:6 38:13
third-party 52:7
52:11
three 10:21
22:16 24:21
29:4 33:3 36:2
36:7,16 41:16
45:25 55:20
67:3
three-year 36:14
47:18
threshold 31:13
42:16

tie 21:8
time 1:20 4:20
8:4 9:6 10:23
15:7 17:22
26:20 27:5,18
27:23,25 31:13
36:2 46:20
68:15 69:13
title 17:18 34:13
today 8:4,14,19
9:24 22:21
25:5 64:22
today's 71:17
tools 21:22
top 31:20
topic 10:20
22:15,17,20
23:4 24:5,21
25:2,4,14
34:22 59:7
topics 10:18,23
11:3 20:23
21:10 22:23
30:19 33:6
64:21
town 14:19
trades 20:18
trainer 33:12
trainers 33:17
training 12:9
30:18 31:20,25
33:9,13,18
36:17,21 37:10
47:15,17
transcript 76:8
Transfers 63:12
63:19,24 64:8
64:18 66:13
trial 1:16 3:7
4:20 7:3
true 76:8
truthful 8:14
try 7:22 13:10
24:2 35:13,16
37:25 39:23
61:22 63:15
trying 9:20
15:13 16:7
18:7 21:8

37:18 65:20
**turn** 10:16 20:22
  36:5
**two** 10:21 23:4
  29:4 40:8 55:9
  68:19 69:8
**two-part** 45:5
**type** 39:13 52:16
  64:14
**typical** 7:18
**typically** 28:24
  32:18

**U**

**U** 3:4 6:2
**Um-hum** 41:25
  48:16
**understand** 8:3
  8:8 9:24 13:2
  13:18 14:20
  15:19,25 16:5
  20:20 28:14
  29:3 31:7 32:4
  34:15 37:10
  38:11 39:6,7
  62:11 71:25
**understood**
  16:17 23:2
  29:9 30:8
  33:16 35:10
  36:23 37:17
  40:15 42:21
  48:9 51:22
  52:20 53:22
  56:4 57:9 58:7
  64:15 65:19
**unfair** 41:15
**Uniform** 3:7
**uninitiated** 14:9
**UNITED** 1:2
**university** 11:12
  30:20 31:2,3,5
  32:6,14,22,24
  33:19 36:12
**unlawfully**
  44:11,22 45:5
**uploaded** 62:13
**use** 26:23

**V**

**vague** 35:2,11
**various** 10:18
  32:3
**vendor** 52:11
  53:2
**vendors** 52:7
**vetting** 43:18
**vice-president**
  17:19,20 19:8
  19:9,21,22,24
  19:24,25 20:4
  20:6 26:16
**view** 12:16
**Villa** 11:12
**violating** 49:19
  55:15 57:12
**violation** 37:23
  51:21 58:5
**violations** 57:23
**visit** 12:20 13:25
**visits** 16:13,15

**W**

**wait** 7:23
**waive** 72:9
**waived** 5:4
**waiver** 4:19
**walk** 28:25
**walks** 33:14
**want** 8:20 16:3
  20:21 21:6
  23:14 28:20
  35:6 41:5 46:4
  50:8 52:22
  53:24 54:9
**wanted** 30:23
  38:18 41:23
  53:6 59:11
**wants** 36:24
**wasn't** 45:14
  60:6
**way** 8:13 27:15
  45:14
**ways** 21:18
**we're** 25:5
**website** 22:10
  28:23
**websites** 22:10
**went** 11:23,24

**weren't** 44:11
**WHEREOF**
  76:14
**wide** 20:16
**WIENER** 2:14
  7:6 9:11 15:15
  21:5 23:11
  24:13 33:25
  34:10,19 35:5
  37:5 38:4
  40:23 41:5
  42:5 43:22
  44:13,23 46:7
  48:4,24 49:23
  50:10,22 53:17
  55:5,18 56:7
  56:25 58:11
  60:3 65:11
  67:11 68:17,22
  72:3,8 74:8
**wishes** 29:14
**withdrawn**
  24:17
**witness** 4:23 5:7
  9:15 21:10
  44:16 49:24
  72:5 76:14
**word** 28:5
**words** 54:5 68:9
**work** 8:10 39:8
  47:2 61:2
**working** 7:15
**works** 45:9
**wouldn't** 8:18
  12:17 32:18
  41:20 70:9
**write** 70:25
**written** 57:20
**wrongs** 54:13

**X**

**X** 1:4,11 74:3

**Y**

**yeah** 15:18 16:2
  16:13,22 20:17
  21:16 23:18
  30:16 32:25
  34:12 42:10
  47:14,18 50:10

51:13 59:24
  65:13
**year** 14:21 33:3
  61:8
**years** 17:5,6
  24:9 36:2,7,16
**York** 1:3,9,12,12
  1:17,21 2:13
  2:13,22 6:16
  10:2 11:5,11
  11:20,23,25
  12:3,6 14:18
  16:11 22:19
  23:17,21 24:8
  24:25 25:7,18
  25:24 26:21
  28:9,21 29:10
  30:25 33:19
  35:14,18 37:4
  37:24 38:13,17
  39:9,17 41:10
  41:22 43:19,20
  44:5,19 46:12
  47:2 48:12,18
  48:21 49:5,16
  50:18,21 52:12
  55:2 57:11,13
  57:18 58:20
  60:12 61:16
  62:17 63:6,18
  63:22 64:6,17
  64:23,25 65:6
  66:10 70:22,24
  70:25 71:15

**Z**

**zone** 30:4

**0**

**02110** 2:7

**1**

**1** 1:1 10:8,11
  71:12 75:9
**10** 10:1 75:9
**10,000** 12:16
**10:00** 1:14
**10036** 2:13
**10591** 6:16
**11** 11:1

**11:13** 73:4
**1114** 1:12 2:13
**12** 12:1 33:5
**120** 14:12
**13** 13:1 75:11
**14** 14:1
**15** 15:1 75:12
**16** 16:1
**17** 17:1
**17th** 76:15
**18** 18:1
**19** 19:1 75:10
**1988** 12:4,12
**1990** 17:25

**2**

**2** 2:1 45:21
  46:14 75:10
**20** 20:1 75:13
**2000** 17:2,3
**2016** 61:8
**2017** 1:13 73:17
  76:6,16 77:23
**21** 21:1
**22** 22:1
**221** 3:7
**221.2** 4:14
**23** 23:1
**24** 24:1
**25** 25:1
**26** 26:1
**27** 27:1
**28** 28:1
**29** 29:1

**3**

**3** 3:1 53:10,15
  75:11
**30** 30:1
**30(b)(6)** 20:23
  21:10
**304** 2:6
**31** 3:14 31:1
**3115** 3:10,20 4:5
**3116** 5:2
**3117** 5:2
**32** 32:1
**33** 33:1
**34** 34:1
**35** 35:1

| | |
|---|---|
| **36** 36:1 | **70** 70:1 |
| **37** 37:1 | **71** 71:1 |
| **38** 38:1 | **72** 72:1 |
| **39** 39:1 | **73** 73:1 |
| | **74** 74:1 |
| **4** | **75** 75:1 |
| **4** 4:1 58:17,22 | **76** 76:1 |
| 75:12 | **77** 77:1 |
| **40** 40:1 | |
| **41** 41:1 | **8** |
| **42** 42:1 | **8** 8:1 |
| **43** 43:1 | **800** 38:21 |
| **44** 44:1 | |
| **45** 45:1 | **9** |
| **46** 46:1 75:10 | **9** 9:1 |
| **47** 47:1 | **94** 18:2 |
| **48** 48:1 | **96** 14:24 |
| **49** 49:1 | **97** 14:24,25 |
| | **99** 2:6 17:2,2 |
| **5** | |
| **5** 5:1 60:19,22 | |
| 69:2 75:13 | |
| **50** 50:1 | |
| **51** 51:1 | |
| **52** 52:1 | |
| **53** 53:1 75:11 | |
| **54** 54:1 | |
| **55** 55:1 | |
| **56** 56:1 | |
| **57** 57:1 | |
| **58** 58:1 75:12 | |
| **59** 59:1 | |
| | |
| **6** | |
| **6** 1:13 6:1 74:7 | |
| 75:9 | |
| **60** 60:1 75:13 | |
| **61** 61:1 | |
| **62** 62:1 | |
| **63** 63:1 | |
| **64** 64:1 | |
| **65** 65:1 | |
| **66** 66:1 | |
| **67** 67:1 | |
| **68** 68:1 74:8 | |
| **69** 69:1 | |
| **6th** 76:5 | |
| | |
| **7** | |
| **7** 7:1 | |